**NORTHERN NATURAL GAS COMPANY**
et al., Plaintiffs,

v.

Ralph GROUNDS, Henry Hitch et al.,
Defendants.

Civ. A. Nos. KC–1969, KC–1945, KC–1946,
KC–1947, KC–1948, KC–1980,
W–3009, and W–3159.

United States District Court
D. Kansas.

Sept. 7, 1968.

As Corrected Oct. 14, 1968.

hardt, Wichita, Kan., for Ashland Oil & Refining Co.

Roy Schaeffer Pampa, Tex., Gerald Sawatzky, Foulston, Siefkin, Powers, Smith & Eberhardt, Wichita, Kan., for Cabot Corp.

George Peabody, Oklahoma City, Okl., Mark H. Adams, Adams, Jones, Robinson & Manka, Wichita, Kan., for Cities Service Gas Co. and others.

R. O. Mason, George Conger, Bartlesville, Okl., P. K. Smith, Wichita, Kan., C. C. Cammack, Tulsa, Okl., for Cities Service Oil Co. and Columbian Fuel Corp.

William R. Horkey, Leon C. Gavras, Tulsa, Okl., Gerald Sawatzky, Foulston, Siefkin, Powers, Smith & Eberhardt, Wichita, Kan., for Helmerich & Payne, Inc.

Horace Ballaine, Tulsa, Okl., Richard Jones, Robert J. Roth, Hershberger, Patterson, Jones & Thompson, Wichita, Kan., for Hugoton Plains Gas & Oil and Mapco Production Co.

Charles B. Wallace, Donald G. Canuteson, William H. Tabb, Dallas, Tex., Richard Jones, Robert J. Roth, Hershberger, Patterson, Jones & Thompson, Wichita, Kan., Robert W. Richards, S. M. Groom, Jr., Oklahoma City, Okl., for Mobil Oil Corp.

Byron M. Gray, Topeka, Kan., G. R. Redding, Baker & Daniels, Indianapolis, Ind., for National Helium Corp.

Gerald Sawatzky, Foulston, Siefkin, Powers, Smith & Eberhardt, Wichita, Kan., for Dorchester Gas Producing Co.

James B. Diggs, Oklahoma City, Okl., Wm. F. Pielsticker, Wichita, Kan., for Gulf Oil Corp.

Patrick J. McCarthy, Omaha, Neb., Cochran, Dudley, Fowler, Rucks, Baker & Jopling, Oklahoma City, Okl., Mark H. Adams, Adams, Jones, Robinson & Manka, Wichita, Kan., for Northern Natural Gas Co. and others.

Arloe W. Mayne, G. Fred Charles, Ashland, Ky., J. M. O'Loughlin, Oklahoma City, Okl., Gerald Sawatzky Foulston, Siefkin, Powers, Smith & Eber-

J. K. Smith, R. H. Landt, Fort Worth, Tex., Norton Standeven, Oklahoma City, Okl., George C. Spradling, of Lilleston, Spradling, Gott, Stallwitz & Hope, Wichi-

ta, Kan., for Pan American Petroleum Corp.

William S. Richardson, Kansas City, Mo., William L. Robertson, Liberal, Kan., Jeff A. Robertson, Topeka, Kan., Emmet A. Blaes and Robert G. Braden, Jochems, Sargent & Blaes, Wichita, Kan., for Panhandle Eastern Pipe Line Co. and others.

Kenneth Heady, Bartlesville, Okl., Richard B. McDermott, Boesch, McDermott & Eskridge, Tulsa, Okl., Joseph Kennedy, Morris, Laing, Evans & Brock, Wichita, Kan., for Phillips Petroleum Co.

R. T. Robberson, Houston, Tex., Richard Jones, of Hershberger, Patterson, Jones & Thompson, Wichita, Kan., for Superior Oil Co.

Philip R. Wimbish, Elmer W. Adams, Tulsa, Okl., Gerald Sawatzky, of Foulston, Siefkin, Powers, Smith & Eberhardt, Wichita, Kan., for Texaco Inc.

Leo Winters, W. A. McWilliams, Oklahoma City, Okl., A. E. Kramer, Kramer, Nordling & Nordling, Hugoton, Kan., Dale M. Stucky, of Fleeson, Gooing, Coulson & Kitch, Harold R. Porter, Wichita, Kan., Gene Stipe and Richard L. Gossett, McAlester, Okl., for Landowners: Ralph Grounds, Henry Hitch, and others.

H. A. Berry, W. M. Sutton, W. E. Notestine, Amarillo, Tex., George B. Collins, of Collins & Collins, Wichita, Kan., for Shamrock Oil & Gas Corp.

Benjamin E. Franklin, U. S. Atty., Kansas City, Kan., Bernard V. Borst, Asst. U. S. Atty., Wichita, Kan., Floyd L. France, William H. Churchwell and Robert M. Perry, Dept. of Justice, Washington, D. C., for the United States.

## MEMORANDUM

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WESLEY E. BROWN, District Judge.

### NATURE OF ACTIONS

These eight consolidated civil actions come before the Court following a protracted trial for findings of fact and conclusions of law with respect to the issues relating to liability. Six of the cases are actions in the nature of interpleader. Two of the actions are for conversion and reverse condemnation.

All of these actions involve the ownership of helium [1] contained in or extracted from natural gas [2] and produced from wells drilled in the Chase Group of the Permian formation of the Hugoton gas area in Kansas, Oklahoma, and Texas. Helium-bearing natural gas is produced from these lands by producers operating under leases granted by landowners and other owners of mineral interests in these lands. This helium-bearing natural gas is then sold by these producers to pipeline companies, who, generally speaking, transport this gas for resale for industrial and consumer use throughout the mid-Continental United States. In the early 1960's pursuant to a helium conservation program approved by the Congress and implemented by the Bureau of Mines and the Department of Interior, four companies contracted to sell helium to the United States. The companies proposed to extract this helium from gas in helium processing plants built on or near large volume pipelines. The United States agreed to purchase

---

1. Helium is a colorless, odorless, and inert gas. It is the second lightest substance, second only to hydrogen. It can be liquified only at –452.1°F., nearly absolute zero. It will not react chemically or physically with any other elements. [LPX 5, p. 10; LPX 19, p. 13; LPX 221, p. 431; LOX 792, Tr. 8:583–599]. References to testimony are designated by the volume numbers and pages of the Transcript. References to exhibits presented on behalf of the pipeline companies, the Helex companies, and the United States are designated as "Helex Ex."; the landowner exhibits are designated "LOX", and the lessee-producer exhibits are designated "LPX". Exhibits of individual lessee-producer exhibits are designated by company name, i. e. "Mobil Ex. ———", etc.

2. We use the term "natural gas" to mean (the condition of) the "aeriform fluid" at the time that it emerges from the wellhead regardless of its composition.

from each company all the extracted helium up to a contract dollar maximum ranging from nine to 15 million dollars a year. From these purchases, the United States supplies its current demands, as well as builds a conserved supply in a Texas storage reservoir.

The fund involved in each interpleader suit is the money paid and to be paid by the United States to the interpleading plaintiffs for the helium-gas mixture produced and sold by them. The claimants to the fund may be grouped, generally speaking, into three classes, referred to collectively herein as the "landowners," the "lessee-producers," and the "helex group," which includes the helium extraction and their parent pipeline companies. The landowners claim, in brief, that helium did not pass to their lessees under the oil and gas, or merely gas, leases by virtue of which natural gas has been and is being produced from their properties. The lessee-producers oppose this position, assert that helium did in fact pass under those leases, but that it passed no further, i. e., that it did not pass to the pipeline companies under the gas purchase contracts under which lessee-producers deliver natural gas from the lands in question. The helex group, comprising three pipeline companies and their subsidiary or parent companies, and Phillips Petroleum Company each assert that helium did in fact pass under the oil and gas leases to the lessee-producer, that it passed further, under the gas purchase contracts, and, that it was theirs to separate out from the natural gas stream in their possession and sell to the United States. The United States concurs in this position.

In the course of our preparation of Findings of Fact and Conclusions of Law we have reviewed and disposed of the motions to which the parties have taken exception in the light of the evidence before us.

3. LPX 150.

4. LPX 151.

## THE PARTIES

Identification of the parties to these actions and statement of their positions will clarify our views. The parties in the interpleader suits, KC–1945, KC–1946, KC–1947, KC–1948, KC–1969, and KC–1980 all claim ownership of or an interest in the interpleaded fund in the particular case.

*KC–1945.*

Cities Service Gas Company was the original interpleading plaintiff in Cases KC–1945, KC–1948. It was subsequently joined, however, by Cities Service Helex, Inc., and Cities Service Cryogenics, Inc., (formerly Cities Service Helium, Inc.), both wholly owned subsidiaries of Cities Service Company, which holds, also, upwards of 79 per cent of the stock of Cities Service Gas Company. These plaintiff corporations are organized under the laws of the State of Delaware and have principal places of business in Oklahoma.

It is necessary to state the contractual relationships between the three parties plaintiff. In brief, Cities Service Gas Company conveyed to Cities Service Helium by contract executed August 17, 1961, "for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable considerations" the right to all helium contained in gas purchased by it and gathered to a central point adjacent to its Grant County, Kansas compressor station, together with the right to extract such helium.[3] Cities Service Helium in turn, by contract dated the following day, August 18, 1961, conveyed these helium rights to Cities Service Helex, Inc., which agreed to pay therefor 1.35 cents for each thousand cubic feet (Mcf) of gas delivered to Cities Service Helex for helium processing.[4] Shortly thereafter, on August 22, 1961, Cities Service Helex contracted to sell helium to the United States.[5]

Cities Service Helex contracted with the Cities Service Gas Company, on Sep-

5. LPX 106.

tember 11, 1961, for the purchase of gas required for operation of its helium extraction plant, and agreed to sell to the Cities Service Oil Company the crude liquid hydrocarbons recovered in the helium extraction process.[6] Cities Service Gas Company is referred to as "Cities."

The named defendant individuals, O. W. Heger, Almeta Redfield, et al., appear individually and as representatives of a landowner class consisting of

"* * * the persons, firms and corporations owning a mineral interest in land from which helium has been, is being or will be severed from the ground in connection with or because of production under oil and gas leases, which helium has been, is being or will be taken into the possession by the United States of America in Grant County, Kansas, at the delivery point described in that certain contract between the United States of America and plaintiff in interpleader Cities Service Helex, Inc., dated August 22, 1961." [7]

The named defendant lessee-producer is Mobil Oil Corporation (formerly Socony Mobil Oil Company), a corporation organized under the laws of the State of New York, with its principal place of business there. Mobil appears both individually and as representative of a lessee-producer class, which

"* * * consists of the persons, firms and corporations denominated 'lessee-producers,' who are the owners of leasehold interest in * * * oil and gas leases [described in the foregoing paragraph] * * *, and who deliver, have delivered or will deliver helium contained in gaseous streams directly or indirectly to Cities Service Gas Company, which helium has been, is being, and will be removed and de-

livered by plaintiff in interpleader, Cities Service Helex, Inc., into the possession of the United States of America at the delivery point described in that certain contract between the United States of America and Cities Service Helex, Inc., dated August 22, 1961." [8]

Cities purchases gas from Mobil pursuant to at least four contracts which are filed as rate schedules of Mobil with the Federal Power Commission.[9] Whether gas delivered under all of these contracts is processed for helium does not clearly appear.[10] Representative lease forms under which Mobil produces gas for sale to Cities are in evidence.[11]

*KC–1946.*

The plaintiffs are identical with those in the preceding case. The named individual defendants, Vivian W. Schuett, R. J. Stuckey, et al., appear both individually and as representatives of the class of landowners and owners of mineral interests as defined in the preceding case. The named defendant lessee-producer is the Ashland Oil and Gas Company, a corporation organized and existing under the laws of the Commonwealth of Kentucky, with its principal place of business in that state. Ashland appears both individually and as representative of the same class of leasehold interest owners as defined in the preceding case, KC–1945.

Ashland produces gas from a block of 119 wells located principally in Grant and Haskell counties, Kansas, and delivers it through an approximately 150-mile gathering system to Cities at a point near the helium extraction plant operated by Cities Service Helex, Inc., in Grant County, Kansas. Representative forms of these leases under which gas is produced for this sale are compiled in Ashland

---

6. LPX 152; LOX 508.

7. Dkt. 1135, KC–1969. In the documentation of the finding "Dkt. ——" followed by case number refers to the docket sheet prepared by the Clerk of the Court for each case; however, after consolidation most pleadings were filed in KC–1969, as the Consolidated file.

8. Ibid.

9. Mobil Exs. 11, 12, 13 and 14, being FPC Schedule Nos. 3, 89, 261 and 262.

10. Tr. 34:3482–83.

11. Mobil Ex. 1; Dkt. 217, KC–1969.

Exhibit 1. These leases were acquired by Ashland on March 1, 1963, from the United Carbon Company, parent of United Producing Company, a previous owner thereof.[12]

The contract under which Ashland delivers gas to Cities was executed originally on March 12, 1948, by United Producing Company, which agreed therein to deliver natural gas to Cities so long as it could be produced from the subject leaseholds in commercial quantities.[13] On October 1, 1954, this contract was filed with the Federal Power Commission as United's FPC Rate Schedule No. 111, and upon acquisition of the leaseholds by Ashland, and FPC approval of the transfer, it became Ashland's FPC Rate Schedule No. 111. Ashland also succeeded to a second gas purchase contract with Cities executed August, 1953, by United now being Ashland's FPC Rate Schedule No. 112. Gas delivered under this contract is not processed for the separation of helium, however.[14]

*KC–1947.*

The plaintiffs are identical with those in each of the preceding cases. The named defendant individuals, Katherine R. Adams, J. H. McMorran, et al., appear individually and as representatives of the class of landowners and owners of mineral interests as defined in the first case, KC–1945. The named lessee-producer is Columbian Fuel Corporation organized under the laws of the State of Delaware, with its principal place of business in the State of New York. Columbian appears individually and as representative of the class of leasehold interest owners defined in the first case, KC–1945.

Columbian sells natural gas to Cities Service Gas under two contracts, executed November 18, 1949, and June 16, 1949.[15] These contracts are filed with the Federal Power Commission, and are included in Columbian's FPC Rate Schedule Nos. 7 and 37. Columbian delivers gas to Cities under a third contract, its FPC Rate Schedule No. 10, but gas delivered thereunder apparently is not processed for helium extraction.[16] Columbian delivers gas to Cities at the tailgate of Mobil's Hickok Plant in Grant County, Kansas.

*KC–1948.*

The plaintiffs are identical with those in each of the preceding cases. The named defendant individuals, Bloyd Burgess, John J. Cecil, et al., appear individually and as representatives of the class of landowners and owners of mineral interests as defined in the first case, KC–1945. The named defendant lessee-producer is the Pan American Petroleum Corporation, organized under the laws of the State of Delaware, with its principal place of business in the State of Oklahoma. Pan American appears individually and as representative of the class of leasehold interest holders as defined for the first case, KC–1945.

Pan American sells gas to Cities under a single contract executed June 23, 1950, by Stanolind Oil and Gas Company, Pan American's predecessor, the contract covering gas produced from approximately 400,000 to 600,000 acres in Kansas Hugoton Field so long as it can be had in commercial quantities. This contract as amended is included in Pan American's FPC Rate Schedule No. 84.[17] Copies of representative lease forms under which this gas is produced are in evidence.[18]

█ Since execution of this contract in 1950, Pan American has executed approximately 168 "farmout" agreements, by which it agreed to assign various leases covering areas dedicated under that contract, these agreements providing specifically that any production therefrom is subject to the Pan American-

12. Ashland Ex. 18–20.

13. Ashland Ex. 5.

14. Tr. 34:3461.

15. Columbian Exs. 8, 9.

16. Columbian Ex. 10.

17. Pan American Ex. 4.

18. Pan American Ex. 1.

Cities contract. Under the standard farmout agreement, the farmout operator drills at his own expense, and upon completion of a commercial well, he becomes owner of the working interest and usually operates the well or arranges for its operation, the assignor retaining a royalty. These operators are independent producers who were required to obtain certificates of public convenience and necessity covering their sales to the Cities Service Gas Company. None of these operators was made a party to this action. By court order they fall within the class of owners of leasehold interests represented by Pan American as a lessee-producer.[19]

*KC–1969.*

Plaintiffs in this interpleader action are Northern Natural Gas Company (Northern), an interstate pipeline company, and two wholly-owned subsidiaries, Northern Helex Corporation (formerly Helex, Inc.) and Northern Natural Gas Products Company, all corporations organized under the laws of the State of Delaware, with their principal places of business in the State of Nebraska.

The named defendant individuals, Ralph Grounds, Henry Hitch, and approximately five hundred other named individuals, appear individually and as representatives of a class defined by the court as comprising

" * * * the persons, firms and corporations owning a mineral interest in land from which helium has been, is being or will be severed from the ground in connection with or because of production under oil and gas leases, which helium * * * is being or will be taken into the possession by the United States of America in Ellsworth County, Kansas at the delivery point described in that certain contract between the United States of America and plaintiff in interpleader Northern Helex, Inc., (formerly Helex Company) dated August 15, 1961." [20]

Eight named lessee-producer companies are defendants in this action.

Ashland delivers natural gas to Northern under two contracts, executed August 25, 1943, and June 28, 1954, these are included in Ashland's FPC Rate Schedule Nos. 116 and 122, respectively.[21]

Cities Service Oil, a Delaware corporation with its principal place of business in the State of Oklahoma, delivers natural gas to Northern under eleven contracts, these being Cities Service Oil FPC Rate Schedule Nos. 53, 70, 89, 166–171, 190, and 191.[22]

Gulf Oil Corporation, a Pennsylvania corporation with its principal place of business there, delivers natural gas to Northern under a single contract, found in Gulf's FPC Rate Schedule No. 117.[23] Representative forms of leases under which this gas is produced are in evidence.[24]

Helmerich & Payne, Inc., is an Oklahoma corporation with its principal place of business in that state. It delivers natural gas to Northern under eight contracts, these being its FPC Rate Schedule Nos. 1, 2, 4–8.[25] Representative forms of leases under which gas is produced for delivery thereunder are also in evidence.[26]

Mapco Production Company, a Delaware corporation with its principal place of business in Oklahoma, delivers gas to Northern under one contract, dated September, 1949, and is Mapco FPC Rate

19. Page 13, infra.

20. Dkt. 1135, KC–1969.

21. Ashland Exs. 7, 10.

22. Cities Service Oil Exs. 7–16. Representative forms of leases under which gas is produced for delivery to both Northern and Panhandle Eastern Pipeline Company, a party to KC–1980, are assembled in Cities Service Oil Co. Ex. 17.

23. Gulf Ex. 3.

24. Gulf Exs. 1, 2; Dkt. 166, 920, KC–1969.

25. Helmerich & Payne Exs. 3–9.

26. Helmerich & Payne Exs. 1, 2; Dkt. 250, 1232, 1235, KC–1969.

Schedule No. 1, formerly Hugoton Plains FPC Schedule No. 1. Representative forms of leases under which gas is produced for delivery under this contract are in evidence.[27]

Mobil delivers gas to Northern under nine contracts, included in its FPC Rate Schedule Nos. 32, 71, 85, 158, 179, 281, 232, 284, and 326.[28] Representative forms of leases are in evidence.[29]

Texaco, a Delaware corporation with its principal place of business in states other than Kansas and Nebraska, delivers gas to Northern under fourteen contracts, these are included in Texaco FPC Rate Schedule Nos. 10, 11, 12, 71, 106–112, 129, 147 and 317. Representative lease forms under which gas is produced for these sales are in evidence.[30]

These named lessee-producers appear individually and as representatives of a class defined by the court as consisting of:

" * * * the persons, firms and corporations denominated 'lessee-producers' who are the owners of leasehold interests in the oil and gas leases * * * [from which gas is produced for delivery to Northern Natural Gas Company] and who deliver, have delivered or will deliver helium contained in gaseous streams directly or indirectly to Northern Natural Gas Company, which helium has been, is being or will be removed and delivered by plaintiff in interpleader [Northern Helex, Inc.], into the possession of the United States of America at the delivery point described in that certain contract between the United States and [Northern Helex, Inc.], (formerly Helex Company), dated August 15, 1961." [31]

Phillips Petroleum Company, a Delaware corporation with its principal place of business in the State of Delaware, was named as an original defendant lessee-producer of gas. Phillips, however, makes no claim to the interpleaded fund, and urges that having disclaimed any interest in the subject matter of the action upon which the court's jurisdiction depends, it should be dismissed therefrom.

Counsel for landowners and Phillips disagree whether the landowners assert cross-claims against Phillips in KC–1969. After examination of the pleadings and pre-trial order, we find that landowners have asserted two cross-claims against Phillips; first, a denial that Phillips has any interest in the fund (which Phillips concedes) and secondly, on the premise that leases do cover helium, landowners seek damages from Phillips on the ground that as a lessee-producer, it has failed to market the helium portion of natural gas with reasonable diligence.

*KC–1980.*

The plaintiff in this interpleader action is National Helium Corporation, organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Kansas.

The Panhandle Eastern Pipe Line Company, a Delaware corporation with its principal place of business in the State of Missouri, was made a party defendant by National Helium. Panhandle owns fifty per cent of the stock of National Helium, with National Chemical and Distillers Company owning the remaining fifty per cent.

No lessee-producer was named as an original defendant in this case. Eight named lessee-producers were first introduced into this case by a third-party complaint filed by defendant Panhandle,[32] wherein Panhandle sought judgment against the named third-party defendants "for all sums that may be adjudged against Panhandle in favor of National Helium * * * or the landowners with respect to gas purchased by

27. Mapco Ex. 1; Dkt. 255, KC–1969.

28. Mobil Exs. 2–9.

29. Mobil Exs. 1, 1A.

30. Texaco Exs. 1, 2; Dkt. 199, 1231, KC–1969 (Leases); Texaco Exs. 3–14, 17 and 33.

31. Dkt. 1135, KC–1969.

32. Dkt. 54, KC–1980.

Panhandle from, and delivered to Panhandle by such third-party defendants * * * " Prior to that time, landowners had filed counterclaims and cross-claims against National Helium and Panhandle respectively, seeking judgment for alleged conversion of helium. National Helium had never asserted any liability against Panhandle, however, so as to authorize a third-party complaint under Rule 14, F.R.Civ.P., which provides that a "defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action *who is or may be liable to him for all or part of the plaintiff's claim against him.*" [Emphasis supplied.]

■ The lessee-producers answered without objecting to improper joinder under Rule 14. They have tendered precisely the same issues for decision in KC–1980 as in the other interpleader cases where they were properly joined, and they have taken precisely the same positions in each of the interpleader cases. Had lessee-producers not asserted their claims to the fund in KC–1980, notwithstanding their third-party status, it would have been incumbent upon the court to join them as defendants under Rule 19, F.R.Civ.P. which provides, in pertinent part, that

"A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if * * * (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may * * * (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party."

It is clear that as a group, their presence was necessary to a full and complete adjudication of rights to the interpleaded fund. Failure to join them would have left a critical gap in the group of claimants necessary to a complete determination of the ownership of helium, and the right to participate in the fund consisting of the proceeds from its sale. We hold that the lessee-producers named in the third-party complaint are properly defendants, individually and as representatives of the class, and we deem them to have been joined under Rule 19. The named lessee-producer defendants are twelve in number.

Ashland delivers gas to Panhandle under eleven contracts, included in Ashland's FPC Rate Schedule Nos. 108, 109, 120, 121, 125, 135, 141, 142, 145, 148 and 177.[33]

Cabot Corporation, a Delaware corporation with its principal place of business in Massachusetts, delivers natural gas to Panhandle under eleven contracts, included in its FPC Rate Schedule Nos. 28, 35, 47, 69, 71, 41, 62, 75, 89, 33, and 66.[34]

Columbian delivers gas to Panhandle under seven contracts, these included in Columbian's FPC Rate Schedule Nos. 2, 31, 33, 36, 40, 75, and 136.[35]

The Shamrock Oil and Gas Corporation, since the commencement of this litigation, has become, as result of a merger, the Diamond Shamrock Corporation, and has been substituted therefor. It is a Delaware corporation, with its principal place of business in the State of Ohio. It delivers gas to Panhandle under four contracts, these included in Shamrock's FPC Rate Schedule Nos. 4, 24, 30, and 32.[36]

The Dorchester Gas Producing Company, a Delaware corporation with its principal place of business in the State of Texas, delivers gas to Panhandle under three agreements, two of which are gas exchange agreements, included in

33. Ashland Exs. 3, 4, 8, 9, 11–17.

34. Cabot Exs. 2–10, 13, 14.

35. Cities Service Oil Exs. 1–6.

36. Columbian Exs. 1–7.

Dorchester's FPC Rate Schedule Nos. 4, 1 and 2.[37]

Gulf delivers gas to Panhandle under eight contracts, being Gulf's FPC Rate Schedule Nos. 51, 68, 100, 167, 171, 200, 237, and 293.[38]

Helmerich & Payne, Inc. delivers gas to Panhandle under two gas purchase contracts, being Helmerich & Payne's FPC Rate Schedule Nos. 28 and 29.[39]

Mobile delivers gas to Panhandle under eleven contracts, being its FPC Rate Schedule Nos. 246, 223, 248, 299, 303, 11, 54, 385, 369, 301, and 245.[40]

Pan American delivers gas to Panhandle under eight contracts, being its FPC Rate Schedule Nos. 134, 194, 196, 221, 223, 276, 365, and 425.[41]

Texaco, Inc., delivers gas to Panhandle under twenty-two contracts, being its FPC Rate Schedule Nos. 142, 136, 152, 164, 171–173, 224, 230, 242, 244, 256, 289, 303, 304, 309, 315, 318, 344, 352, 353, and 367.[42]

Superior Oil Company is a Nevada corporation with its principal place of business in the State of Texas. Superior delivers gas to Panhandle under three contracts, included in its FPC Rate Schedule Nos. 110, 1, and 43.[43]

These named lessee-producer defendant appear individually and as representatives of a class defined by the court as comprising

" * * * the persons, firms and corporations denominated 'lessee-producers,' who are the owners of leasehold interests in the oil and gas leases [from which gas is produced for delivery to Panhandle Eastern Pipe Line Company] and who deliver, have delivered or will deliver helium contained in gaseous streams directly or indirectly to Panhandle Eastern Pipe Line Company, which helium has been,

is being or will be removed and delivered by plaintiff in interpleader National Helium Corporation into the possession of the United States of America at the delivery point described in that certain contract between the United States and National Helium Corporation dated October 13, 1961." [44]

The named defendant individuals, Ralph Grounds, Henry Hitch, and approximately five hundred other individuals appear individually and as representatives of a class defined as comprising

" * * * the persons, firms and corporations owning [a] mineral interest in land from which helium has been, or is being, or will be severed from the ground in connection with or because of production under oil and gas leases, which helium has been, is being or will be taken into possession by the United States of America in Seward County, Kansas at the delivery point described in that certain contract between the United States of America and plaintiff in interpleader National Helium Corporation dated October 13, 1961." [45]

Phillips was introduced into this case as a third-party defendant by landowners, alleging underpayment of royalties on gas produced in Moore and Hansford Counties, Texas.[46] This claim has been withdrawn. The remaining counts of that third-party complaint were never addressed to Phillips, and it may not be required to respond to those claims for the first time after trial. Phillips' request for findings of fact and conclusions of law demonstrating the lack of independent jurisdictional grounds for the claim is therefore moot.

We conclude in KC–1980 that lessee-producers are proper parties both individually and as representatives of a class; that Phillips must be dismissed

37. Dorchester Exs. 4, 5, 6.
38. Gulf Exs. 15–22.
39. Helmerich & Payne Ex. 10.
40. Mobil Exs. 15–25.
41. Pan American Exs. 5–12.
42. Texaco Exs. 15, 16, 18–32, 34–38.
43. Superior Exs. 2, 3, and 4.
44. Dkt. 1135, KC–1969.
45. Ibid.
46. Dkt. 163, KC–1980.

on the ground that no claim is asserted against it.

*W–3009.*

The original plaintiffs in this case are Oliver S. Brown, Harry Lightcap, T. A. Dudley, Dan C. Sullivan, Jr., L. F. Roderick, Stanley Julian, the E. W. Campbell Estate, Ruth C. Rice, Executrix, Herbert and Norma Foster, Fred Shore and Hazel Shore, Gerald G. Finley, A. W. Klassen, John Alford, Robert Larrabee, Robert Larrabee as Executor of the Estate of Lee Larrabee, Deceased, Emil Schnellbacker, Wylie R. Gore, George H. Anderson, Ora V. Martin and Lela Z. Martin, and Gene Cyr. The intervening plaintiffs are Alfred Akers (Akin), Chester C. Clark, Dorothy M. Cox, Della M. Drake, John R. Jones, Bertha E. Kells, C. A. Kells, a/k/a Chester A. Kells, W. L. Lacey, L. G. Moore, Warden L. Noe, Bernard J. Nordling, Homer Leroy Parshall, Leone L. Parshall, Lillie Snare (Snarl), June Stegman as Guardian of Patricia A. Stegman, June Stegman as Guardian of Victor J. Stegman, and Edith Thompson. These parties appear individually and as representatives of a class defined by the court as consisting of:

" * * * the persons, firms and corporations owning mineral interests in land from which helium has been, or is being severed from the ground in connection with or because of production under oil and gas leases, which helium has been, or is being taken into the possession of the defendant United States of America at points in Seward, Ellsworth or Grant Counties, Kansas, or Hansford or Moore Counties, Texas, described in the four following contracts:

(a) Contract between United States of America and Helex Company, now Northern Helex Company, dated August 15, 1961.

(b) Contract between United States of America and Cities Helex dated August 22, 1961.

(c) Contract between United States of America and National Helium dated October 13, 1961.

(d) Contract between United States of America and Phillips dated November 13, 1961." [47]

The United States is the sole defendant in this case. It has joined as third party defendants National Helium, Cities Service Helex, Inc., Northern Helex Company (formerly Helex Company) and Phillips, the parties to the four contracts recited in the foregoing paragraph.

*W–3159.*

The named original plaintiffs in this action are Ralph Grounds and Henry Hitch, Jr. Intervening plaintiffs are Robert Adams, C. Dale Duer, Hubert R. Elrod, Ruth F. Fischer, Zuba D. Jefferis, Alonzo C. Robinson, the John A. Spohn Estate, W. D. Ross and Herb Williams. These parties appear individually and as representatives of the class of plaintiff as defined in the preceding case, W–3009. Again, the United States is the sole defendant, and it has impleaded as third-party defendants the same four corporations impleaded in the preceding case, W–3009.

### CLASS ACTIONS

The Court has, in the light of the evidence and recent decisions, reconsidered its rulings designating certain named representatives of described classes for the prosecution and defense of certain claims in each of the consolidated cases.

The basic prerequisites for maintenance of a class action are stated in Rule 23(a), F.R.Civ.P.:

"(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will

47. Dkt. 1135, KC–1969.

fairly and adequately protect the interests of the class."

In addition, the action must satisfy one or more of four prerequisites stated in Rule 23(b).

By order filed January 16, 1967,[48] the Court defined the classes of landowners and lessee-producers in each interpleader case as set out supra under the heading, "Parties." In addition, we defined the class of plaintiff landowners in W–3009 and W–3159. As to each class, we found that the class was so numerous that joinder of all members was impracticable, that there were questions of law or fact common to each class, that the claims and defenses of the representative parties in each class were typical of the claims and defenses of the class, that the representative parties would fairly and adequately protect the interests of the class.

We found further as to each class that the further prerequisites of Rule 23(b) (1) (A) and (B) were met, in that prosecution of separate actions by or against individual members of the class would create a risk of:

"(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing, the class, [and]

"(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; * * *."

A separate finding was made as to the class of lessee-producers in KC–1980, on the ground that claims by and against members of that class met the prerequisite of Rule 23(b) (3), in that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy."[49] We adopt these findings herein.

In our view, these actions are eminently suited to class proceedings. There are estimated to be approximately 30,000 persons who receive income from the production of helium-bearing natural gas from which helium is extracted, by virtue of ownership of land, mineral interest, and/or royalty or other interests. These cases have required lengthy, extensive and costly discovery proceedings, the expenditure of many hours in legal research, assembly and preparation of exhibits, numerous pretrial appearances, in addition to the conduct of a forty-three day trial. [Counsel for landowners state that their expenditures to date exceed $90,000.] To require thousands of individual landowners to present their claims to the fund individually would encumber these interpleader actions with procedural and other complexities of perhaps unmanageable proportions. Likewise, in cases W–3009 and W–3159, the class proceeding permits the economical and expeditious resolution of many claims in one proceeding. As stated in Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2nd Cir. 1968):

"Class actions serve an important function in our judicial system. By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress for claims which would otherwise be too small to warrant individual litigation." 391 F.2d at 560.

Likewise, the lessee-producers are very numerous. Each interpleading pipeline it is estimated has several hundred gas purchase contracts in the area. Joinder of vendors under all these contracts would be impracticable and unnecessary.

48. Dkt. 1135, KC–1969.

49. Dkt. 66, KC–1980.

■ Cities takes the position that the landowner representatives cannot adequately represent the entire class of landowners, because of alleged conflicting and antagonistic interests between two sub-groups of the class, those whose recovery depends entirely upon a determination that helium is "gas" within the terms of mineral conveyances, oil and gas leases, unitization agreements and like documents, and those whose recovery would be enhanced by a determination that helium is *not* "gas" within the terms of such documents.

Certain lessee-producers argue that the landowner class cannot sue or be sued as a class unless they are divided into seven sub-classes as authorized by Rule 23(c)(4).[50]

Of the recited sub-classes, five claim in common that leases do *not* cover helium. Within those five sub-classes, there is no antagonism or conflict of interest between those who may claim all or only a proportionate share of helium or the proceeds from its sale. Lessee-producers envision two sub-classes as claiming that leases *do* cover helium, and claiming in addition that lessee-producer gas purchase contracts provide no payment for helium contained in natural gas delivered thereunder. We would point out that these two sub-classes would also recover if leases were found *not* to cover helium. We fail to perceive any antagonism or conflict of interest among the sub-classes with respect to the issues here involved.

Landowners in pleading and presenting their case have sought recovery on alternative propositions: One, that the leases do *not* convey helium; the other, that they do, but that landowners have not been paid therefor. The Court remains convinced that there is no occasion to create seven sub-classes among landowners to present separately, two alternative and mutually exclusive theories, which have both been most ably investigated, pleaded and tried by counsel in behalf of the landowner class.

■ In Cases W–3009 and W–3159, the United States denies that "all owners of lands or mineral interests from which helium-bearing natural gas is produced which is the subject matter of this action comprise a class which can be represented by the named plaintiffs (Landowners) in this action."[51] The United States does not specify in what particular respects the representative parties, or their counsel, fail to represent adequately the absent members of the class, or in what respect their claims and defenses are not typical of those absent persons. For the reasons stated supra in this section, we remain of the view that the claims of representative landowners are typical of those of absent members, that they raise questions of fact and law common to the class, and that the representative parties have fully represented and protected the interests of the entire class.

■ Lessee-producers have renewed objections to orders of the court, all entered prior to July 1, 1966, finding that landowners constituted a "true" class in each of the interpleader cases.[52] Rule 23 as amended became effective July 1, 1966, and was applied to all pending cases in subsequent class rulings. However, the order of January 16, 1967, in which the classes were defined, provided that "classes previously defined by the court in regard to claims of * * * Northern Natural Gas Company and Northern Helex Company in KC–1969 and claims of third-party plaintiff Panhandle Eastern Pipe Line Company in KC–1980 are not affected by this order." The class of landowner defendants in KC–1980 was previously denominated a "true" class.[53] This categorization was important under the old rule principally for identifying persons bound by the judgment, and helping in turn to determine the res judicata effect of the judgment if questioned in a later action. See Notes of Advisory Com-

---

50. See, e. g., Dkt. 1047, KC–1969.

51. Pre-Trial Order, W–3009, W–3159, p.

52. Dkt. Nos. 535–538, 649, KC–1969.

53. Dkt. 649, KC–1969.

mittee on Rule 23. We determine that the extent of the judgment in this case is to be governed under Rule 23 as amended. These objections are thus mooted.

Lessee-producers object to the court's order that Panhandle's third-party complaint in KC–1980 be maintained against them both individually and as representatives of a class of approximately 540 producers who sell natural gas to Panhandle which is processed for helium extraction. Maintenance of this complaint against the third-party defendants as a class was ordered under Rule 23(b)(3), for which the court made the requisite finding that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy."[54] Accordingly, the court directed notice be given to absent members of the class.

Rule 23(b)(3) recites four "non-exhaustive factors" to be considered in authorizing a class proceeding under that subsection:

> "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

At no time prior to trial did it appear that any individual member of the class had any interest in exercising separate control over the prosecution or defense of any claim, that any prior litigation existed between Panhandle and any member of the lessee-producer class respecting the issues raised in the third-party complaint, that it was not desirable and in the interest of expedition and economy of litigation to concentrate litigation of Panhandle's claims against all its gas vendors in one particular forum, or that a class proceeding would occasion any special difficulties. Moreover, it was clear that questions of law and fact common to members of that class predominated over questions affecting only individual members, and that permitting maintenance of the claims of Panhandle's gas vendors to the fund in the interpleader action was superior to any other available method for the fair and efficient adjudication of the lessee-producers' claims to that fund in KC–1980. After trial, with the benefit of hindsight, the court remains convinced of the correctness of the order regarding the class of lessee-producers in KC–1980, and we decline to disturb it.

We find that the representation of the interests of both classes is fully adequate, on at least two grounds. First the representation by counsel for both the landowner and lessee-producer classes has been of the highest quality. Their presentation reflected diligent, careful, and incisive attention to the interests of the class. In addition to the most careful investigation by deposition, interrogatories and other discovery of facts, they have explored fully, in evidence, briefs and arguments, what must surely be every conceivable theory which the facts could possibly support.

Secondly, the very number of representative parties is substantial. There are over 200 named landowner claimants in KC–1945; seven in KC–1946; six in KC–1947; 45 in KC–1948; over 500 in KC–1969, and over 300 in KC–1980, in addition to those named in W–3009 and W–3159, some of whom appear in the interpleader cases, also. Thus, in toto, over one thousand landowners advanced claims in their own behalf and that of others similarly situated in all these consolidated cases.

Lastly, we turn to the question of notice to the members of the landowners and lessee-producer classes to whom the

---

54. Dkt. 66, KC–1980; See Motion, Dkt. 58, KC–1980.

court has not yet directed notice to be given, which includes all except the lessee-producer class in KC–1980. In our order filed January 16, 1967,[55] the court found that the claims of all the classes met the requirements of Rule 23(b)(1)(A) and (B), and that accordingly notice to absent members of those classes was not required at that stage of the case, prior to trial on the issues of liability alone. This holding was based on the view that notice to absent members was required only when the class proceeding was founded upon Rule 23(b)(3).

Subsection (c)(2) provides as follows:

"In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion, may, if he desires, enter an appearance through his counsel."

Absent requirement of notice in class proceedings under Rule 23(b)(1) and (2), we regarded notice as mandatory only for class proceedings under 23(b)(3). The Court of Appeals for the Second Circuit in May, 1968, addressed itself to this point, thus:

"We must also note that plaintiff's effort to qualify the action under 23(b)(1) and 23(b)(2) was induced by his erroneous theory that notice is not 'mandatory' under these sections. This theory is based on the assumption that 23(c)(2) provides the only 'mandatory' notice required by the new rule. Since this particular section refers exclusively to actions brought under 23(b)(3), other suits cognizable under either 23(b)(1) or 23(b)(2) would only be subject to 'discretionary' no-

tice under 23(d)(2). Nevertheless, we hold that notice is required as a matter of due process in all representative actions, and 23(c)(2) merely requires a particularized form of notice in 23(b)(3) actions. * * *" Eisen v. Carlisle & Jacquelin, 391 F.2d 555, at 564–565 (2nd Cir. 1968) [Footnotes and citations omitted.]

We think that the essential requisite of due process as to absent members of the class is not notice, but the adequacy of representation of their interests by named parties. As stated in Dolgow v. Anderson, 43 F.R.D. 472 (E.D. N.Y.1968):

"The Supreme Court has indicated that adequacy of representation, not form of notice, is the crucial consideration. See Hansberry v. Lee, 311 U.S. 32, 42, 61 S.Ct. 115, 118, 85 L.Ed. 22 (1940) ('this Court is justified in saying that there has been a failure of due process *only in those cases where it cannot be said that the procedure adopted, fairly insures the protection of the interests of absent parties who are to be bound by it.*')" [Emphasis by the court.] 43 F.R.D. at 500.

We cannot, of course, determine the res judicata effect of the judgment entered herein, but we deem in the public interest that the extent of the judgment be as broad as constitutionally permissible. We think this interest will be best served by directing that "the best notice practicable under the circumstances" be given all members of the class of landowners and lessee-producers, prior to entry of judgment, apprising them of the extent of the proposed judgment and providing any member thereof adequate time to signify his dissatisfaction with the adequacy of representation of his interest, and to advance any new claim to the interpleader fund, or against the United States which arises out of his status as a member of the described class and which has not been adjudicated herein.

The present view of the Court, is that the best notice practicable includes indi-

55. Dkt. 1135, KC–1969.

vidual notice to all members of each class, and that this can be accomplished with "reasonable effort."

## JURISDICTION

The basic jurisdiction of the Court is premised upon 28 U.S.C. Section 1335; 1397 and 2361.

 Jurisdiction of the six interpleader cases is founded upon 28 U.S.C. Section 1335, which provides as follows:

"(a) The district courts shall have original jurisdiction of any civil action of interpleader or in the nature of interpleader filed by any person, firm, or corporation * * * having in * * * its custody or possession money or property of the value of $500 or more, * * * or being under any obligation written or unwritten to the amount of $500 or more, if

(1) Two or more adverse claimants, of diverse citizenship as defined in section 1332 of this title, are claiming or may claim to be entitled to such money or property, or to any one or more of the benefits arising by virtue of any note, bond, certificate, policy or other instrument, or arising by virtue of any such obligation; and if (2) the plaintiff has deposited such money or property or has paid the amount of or the loan or other value of such instrument or the amount due under such obligation into the registry of the court, there to abide the judgment of the court, or has given bond payable to the clerk of the court in such amount and with such surety as the court or judge may deem proper, conditioned upon the compliance by the plaintiff with the future order or judgment of the court with respect to the subject matter of the controversy.

(b) Such an action may be entertained although the titles or claims of the conflicting claimants do not have

a common origin, or are not identical, but are adverse to and independent of one another."

In State Farm Fire & Cas. Co. v. Tashire, 386 U.S. 523, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967), the Court established the principle that in interpleader actions under § 1335, only "minimal diversity" is required, that is, diversity of citizenship between any two adverse claimants. Such diversity exists in these cases.

 By the terms of the above statute, jurisdiction is dependent upon deposit of the money or property in court by the interpleading party, or else the giving of bond "with such surety as the court or judge may deem proper." Farmers Elevator Mutual Insurance Company v. Jewett, 394 F.2d 896 (10th Cir. 1968).

In KC–1945, Cities Service Gas has given bond in the sum of $16,000, with proper surety,[56] and Cities Service Helex gave like bond upon entry into the case.[57] Cities Service Helium (now Cryogenics), joined as an involuntary plaintiff, filed no bond, so far as appears. In KC–1946, –1947, –1948, Cities Service Gas and Cities Service Helex each filed the following respective bonds: $15,000;[58] $12,000;[59] $32,000.[60] In KC–1969, Northern Natural Gas and Northern Helex jointly filed a bond, with surety, of $100,000.[61] In KC–1980, National Helium filed bond with surety of $100,000. Ashland Oil & Refining Company moved December 15, 1966, to enlarge the bonds in cases KC–1947, –1969, and –1980, to not less than $75,000,000, $75,000,000, and $110,000,000, respectively,[62] these sums based on movant's estimates that during a period of six years projected to elapse from the commencement of helium extraction operations and sales by the interpleading plaintiffs in those cases until judgment herein, proceeds by the plaintiffs would total approximately $64,000,-000, $67,000,000, and $107,000,000, re-

---

56. Dkt. 5, KC–1945.

57. Dkt. 48, KC–1945.

58. Dkts. 5, 37, KC–1946.

59. Dkts. 5, 39, KC–1947.

60. Dkts, 5, 58, KC–1948.

61. Dkt. 5, KC–1969.

62. Dkt. 1095, KC–1969.

638

spectively. After argument, the motion was withdrawn.[63] Shortly thereafter, counsel for Cities Service Gas Company filed an order reciting a statement and agreement made in open court that "Cities Service Gas Company would be responsible for and would pay and satisfy any final money judgment against Cities Service Helex, Inc., or Cities Service Cryogenics, Inc., in this action which is not otherwise paid or satisfied," the captioned case being KC–1946 only.[64]

*The Interpleaded Funds.*

It has been generally agreed since the commencement of these cases that the funds involved consisted of the proceeds from the sale of helium. The interpleading plaintiffs have been and presently are making sales of helium only to the United States.

The Court finds that in cases KC–1945 through KC–1948, the fund consists of all proceeds received and to be received by Cities Service Helex, Inc., from the United States as payment for helium contained in a helium-gas mixture delivered to the United States pursuant to that contract between the United States and Cities Service Helex, Inc., executed August 22, 1961. Stated otherwise, the subject matter of these four cases consists of the obligation of Cities Service Helex, Inc., to pay the proceeds received by it from the sale of helium to the United States or to any other purchaser, to any person found to be the owner of such helium, or to be otherwise entitled to participate in such proceeds.

The Court further finds that the fund interpleaded in KC–1969 consists of all proceeds received or to be received by Northern Helex, Inc. (formerly Helex, Inc.) as payment for helium contained in a helium-gas mixture delivered to the United States under that contract between the United States and Helex, Inc., dated August 15, 1961. Stated otherwise, the subject matter of the action consists of the obligation of Northern Helex, Inc., to pay the proceeds received by it from

the sale of helium to the United States, or to any other purchaser, to any person found to be the owner of such helium, or to be otherwise entitled to participate in such proceeds.

The Court further finds that the fund interpleaded in KC–1980 consists of all proceeds received and to be received by National Helium Corporation from the United States as payment for helium contained in a helium-gas mixture delivered to the United States under a contract executed October 18, 1961. Again, stated more broadly, the subject matter of the action consists of the obligation of National Helium to pay the proceeds received by it as payment for helium sold to the United States or to any other purchaser, to any person found to be the owner of such helium, or to be otherwise entitled to share in the proceeds of its sale.

The foregoing funds were not those initially interpleaded by plaintiffs in the Cities cases and in KC–1980. The landowners moved to dismiss all six interpleader actions for want of jurisdiction, arguing, inter alia, that the funds before the Court did not include the amounts received by the interpleading plaintiffs from the sale of helium to the United States. The Court overruled this motion, stating that the "subject matter in controversy as contemplated by the interpleader statute is the claim of ownership under the mineral leases of the helium produced and marketed." This ruling was affirmed in Grounds v. Northern Natural Gas Co., 327 F.2d 1003 (10th Cir. 1964) (per curiam).

Subsequent to this ruling, the subject fund was more precisely defined and enlarged. By order filed January 10, 1967, the fund in the Cities cases (KC–1945, –1948) was defined thus:

"Counsel for plaintiffs [the Cities group] states that the interpleaded fund involved in such four law suits, is the proceeds from the sale of all the helium which has been or is being ex-

63. Dkt. 1137, KC–1969.

64. Dkt. 1139, KC–1969.

tracted by Cities Service Helex, Inc." [65]

In KC–1980, plaintiff National Helium interpleaded at the outset only its obligation to pay to Panhandle $2.06 per Mcf for helium extracted from the gas stream belonging to Panhandle. It did not interplead the monies received for its sale to the United States. In the commencement of that action, however, National Helium sought and obtained an injunction against further prosecution of a declaratory judgment action in an Oklahoma state court, in which plaintiffs sought a determination that they were the owners of and entitled to the net value of all helium sold by National Helium to the United States, thus putting in issue in that state court case the right to entire payments for helium received by National Helium for helium sales to the United States. The discrepancy between the scope of the two cases was raised at a hearing April 20, 1964, after the Tenth Circuit ruling supra. Counsel for National Helium then stated that "if the pleading (in KC–1980) is not as broad as the pleading in the State Court so that the issues are not the same, that we will make them the same." Counsel stated further at that hearing:

"Your Honor, what I have been trying to say was that in the National Helium case, at least, we look upon the liability of National Helium as the value of the helium, whatever it may be, more or less. I mean it might be more than eleven dollars. It might be less. We accept the liability of National Helium for the value of the helium and that ought to clear the air as far as National Helium goes." [66]

Although examination of the files discloses no amendment of the pleadings, we cannot but conclude from the foregoing that the interpleaded fund in KC–1980 is as we have determined it to be.

*Jurisdiction of Landowners' Cross-Claims.*

The landowners' claim to the fund rests on one of two theories; first, that oil and gas leases in which they hold interests and under which natural gas is produced do not convey helium as a constituent of the "gas" leased thereunder, and secondly, that the helex companies are unjustly enriched by monies received by them from the sale of helium.

In addition to their claims against the fund, however, landowners have asserted cross-claims against the lessee-producers, the assertion of which is contingent upon a finding that landowners have no interest in the interpleaded funds themselves. Landowners urge that if the leases do cover helium, first that they have not been paid the proper royalties therefor under the fractional royalty provisions of the leases, and are entitled to recover royalties based upon the fair and reasonable value of helium as attained by reason of its severance from the stream and subsequent marketing; alternatively, landowners urge that the lessee-producers have failed to market helium produced under such leases with reasonable diligence, and seek cancellation of the leases as to the helium portion of the gas stream.

Rule 13(g) F.R.Civ.P. provides thus:

"A pleading may state as a cross-claim any claim by one party against a co-party arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein or relating to any property that is the subject matter of the original action. Such cross-claim may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant."

Lessee-producers urge that these cross-claims do not relate to the "property that is the subject matter of the action," the proceeds received by the plaintiffs from the sale of helium, that these claims are not ancillary to the interpleader subject matter, that in fact, they are alternative claims not against the fund nor the holders thereof, but against co-claimants

---

65. Dkt. 1114, KC–1969.

66. Tr. 10:780–781.

founded upon independent contracts, the leases, recovery upon which claims would leave the interpleaded funds intact, and would further require, the granting of in personam judgments against the lessee-producers, which is beyond the jurisdiction of the court in statutory interpleader actions.

In Knoll v. Socony Mobil Oil Company, 369 F.2d 425 (10th Cir. 1966), cert. denied, 386 U.S. 977, 87 S.Ct. 1173, 18 L. Ed.2d 138 (1967), the Court stated thus:

"A related jurisdictional issue is whether the trial court erred in enjoining appellants from asserting any title in or to the 'above described property' in any manner inconsistent with the terms of its order and judgment. This was an *in personam* exercise of jurisdiction. In an interpleader action, however, *in personam* jurisdiction extends only to the fund deposited with the court. Since the trial court was limited to disposition of the *res*, we must hold that the court lacked jurisdiction to enter this order." 369 F.2d at 429.

The fund before the Court in that case was the money held by Mobil and owing to the true owners of certain property and lease-hold rights therein, from which it had produced oil. The injunction extended beyond the *res*, precluding claimants from asserting any title in the realty itself.

■ In Erie Bank v. United States District Court for the District of Colorado, 362 F.2d 539 (10th Cir. 1966), the Court held that in an interpleader action in which the plaintiff asserted no claim to the deposited fund, it lacked jurisdiction over a counterclaim by a claimant against the disinterested stakeholder on the ground that the latter was not an "opposing party" within Rule 13. It would appear to follow that when the stakeholder was himself an interested party, a counterclaim would be not only permissible under Rule 13, but compulsory thereunder, and the Court would be empowered to enter judgment on such counterclaim.

■ As to landowners' cross-claims, however, for additional royalties on helium or on the value of natural gas as allegedly enhanced by the presence of helium, and for cancellation of leases as to helium for failure to market same, we must agree with the lessee-producers that those claims do not relate to the subject matter of the action. It is true that landowners' claims are founded upon the identical leases upon which lessee-producers base, in important part, their claims to the fund. In interpleader actions, however, the "subject matter of the action" is not a set of facts, a transaction or other occurrence which gives rise to litigation, but a specific identified fund or property. Claims must not only "relate" to that property, but be asserted against it, as we view the present law of this Circuit.

This is a type of case of which the Supreme Court spoke in State Farm Fire & Cas. Co. v. Tashire, 386 U.S. 523, 87 S. Ct.1199, 18 L.Ed.2d 270 (1967), "where a stakeholder, faced with rival claims to the fund itself, acknowledges—or denies—his liability to one or the other of the claimants. In this situation, the fund itself is the target of the claimants. *It marks the outer limits of the controversy.*" 386 U.S. at 534, 87 S.Ct. at 1205, 18 L.Ed.2d at 277. [Emphasis supplied.] [Footnote omitted.] We therefore lack jurisdiction over the landowners' cross-claims against their lessee-producers.

*Jurisdiction of Pipeline Counterclaims.*

■ The lessee-producers claim the fund on the ground that helium, a non-combustible and non-hydrocarbon component of the gas stream, did not pass to the pipeline companies under the gas purchase contracts between the parties. Accordingly, the pipeline companies, Cities Service Gas, Northern Natural and Panhandle have asserted counterclaims against the lessee-producers on their warranties of title in contracts with pipeline companies contingent upon the recovery by the producers of the funds.

These claims are twofold: First, it is asserted that warranties of title in the parties' gas purchase contracts extend to

the full gas stream, and that if only the hydrocarbon portion passed thereunder, the lessee-producers must respond to the purchasers for breach of warranty respecting the balance of the stream. Alternatively, pipeline companies seek recovery from each of the lessee-producers of that percentage of all payments made under the gas purchase contracts which the volume of non-combustible constituents including helium bears to the volume of the total stream.

These counterclaims are founded upon the identical gas purchase contracts under which the lessee-producers claim the fund. They arise out of the "transaction * * * that is the subject matter of the opposing party's claim," or they relate to property that is the subject matter of the original action. We conclude that these counterclaims are permissible under Rule 13, insofar as they affect the rights of the parties to participate in the fund.

*Jurisdiction of Claims Asserted Against the United States.*

An additional jurisdictional problem is raised in the actions by landowners against the United States. The United States denies first that the landowners constitute a class, a question we have heretofore disposed of,[67] and contends further that the United States is not subject to suit by a class. In each of these cases, the landowners assert two separate claims against the government. First, they assert ownership of the helium being delivered to the United States by each of the helium extracting companies, and urge that the United States has appropriated and converted helium so delivered to its own use, and must respond to plaintiffs for the fair, just and reasonable value of same. Jurisdiction for this claim under the Tort Claims Act is asserted under 28 U.S.C. § 1346(b), which confers upon the district courts exclusive jurisdiction of:

"civil actions on claims against the United States, for money damages, * * * for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

Plaintiffs' second claim commingles theories of third-party beneficiary rights and reverse condemnation. It is alleged that the United States has acquired possession of the helium-gas mixture received from its vendors by the exercise of its power of eminent domain, and further that the contracts under which the United States purchases helium provide for payment therefor to the owners thereof, and that as such owners, the plaintiffs are third-party beneficiaries thereof. Jurisdiction for this second claim under the Tucker Act is asserted under 28 U.S. C. § 1346(a) (2), which confers upon the district courts, concurrent with the Court of Claims, jurisdiction over the following cases:

"(2) Any other civil action [other than enumerated tax-related actions] or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

Although landowners alleged that no individual claim may exceed $10,000, they have stipulated that claims of some individuals exceed that sum.[68]

The defendant United States asserts that the United States is not liable to suit by a class without its consent, that since neither § 1346(b) or § 1346(a) (2) makes express provision for suit by a

---

67. Page 634, supra, (Class Actions).

68. Dkt. 527, KC–1969; See Government's Brief, Dkt. 892, KC–1969; Dkt. No. 59, W–3009.

class, no such consent has been given. The government invokes the principle that statutory waivers of sovereign immunity are strictly construed, that waivers are not lightly implied, and that no justification exists for implying such a waiver in favor of a class of plaintiffs, most of whom are not identified.

It is further argued that under the Tucker Act, [68a] and its predecessor statutes dating back to 1855, no court has granted relief in a class action against the government, and that neither the Tucker Act nor the Tort Claims Act adopted in 1946 has been amended by Congress to provide for such proceedings. Defendant further complains of the burden falling upon the government by the difficulties of payment of judgments in favor of a large class of plaintiffs, many of whom are not now identified. Payment of persons holding judgments against the United States rendered in the district courts is authorized in 28 U.S.C. § 2414, payments to be made on settlements by the General Accounting Office upon certification by the Attorney General that the judgment is final, that is, that no appeal will be taken therefrom or that no further review will be sought of a decision affirming the same. This burden does not seem substantial. Rule 23 requires that "[t]he judgment in an action maintained as a class action under subdivision (b)(1) or (b)(2), [the instant case] whether or not favorable to the class, shall include and describe those whom the court finds to be members of the class."

Notwithstanding that Rule 1, F.R. Civ.P., provides that "[t]hese rules govern the procedure in the United States district courts in *all* suits of a civil nature * * * with the exceptions stated in Rule 81," (none of which apply) [Emphasis supplied.] it is argued that absent an express consent to suit by a class, no jurisdiction exists, and that under Rule 82, the rules "shall not be construed to extend * * * the jurisdiction of the United States district courts." In United States v. Sherwood, 312 U.S. 584, 61 S.Ct. 767, 85 L. Ed. 1058 (1941), the Court stated:

> "The jurisdiction thus limited [by the Tucker Act] is unaffected by the Rules of Civil Procedure which prescribe the methods by which the jurisdiction of the federal courts is to be exercised, but do not enlarge the jurisdiction." 312 U.S. at 591, 61 S.Ct. at 772, 85 L.Ed. at 1064.

The Court stated further that the Tucker Act "must be interpreted in the light of its function in giving consent of the Government to be sued, which consent, since it is a relinquishment of a sovereign immunity, must be strictly interpreted." 312 U.S. at 590, 61 S.Ct. at 771, 85 L.Ed. at 1063.

■ The Court again addressed itself to the canon of strict construction in United States v. Yellow Cab Co., 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523 (1951), where it stated, quoting United States v. Aetna Cas. & Surety Co., 338 U.S. 366, 383, 70 S.Ct. 207, 94 L.Ed. 171, 186, 12 A.L.R.2d 444 (1949):

> " 'In argument before a number of District Courts and Courts of Appeals, the Government relied upon the doctrine that statutes waiving sovereign immunity must be strictly construed. We think that the congressional attitude in passing the Tort Claims Act is more accurately reflected by Judge Cardozo's statement in Anderson v. [John L.] Hayes Construction Co., 243 N.Y. 140, 147, 153 N.E. 28, 29–30: "The exemption of the sovereign from suit involved hardship enough where consent has been withheld. We are not to add to its rigor by refinement of construction, where consent has been announced." ' " 340 U.S. at 554, 71 S.Ct. at 406, 95 L.Ed. at 532.

In Capital Transit Co. v. United States, 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523, companion case to and decided with *Yellow Cab,* supra, the defendant sought to implead the United States as a third-

---

68a. Act of March 3, 1887, c. 359, 24 Stat. 505.

party defendant, as a joint tort-feasor obligated to contribute to any judgment ultimately won by the plaintiff. The lower court dismissed the third-party complaint, holding it barred on the ground that no consent to such suit had been given. The Court reversed, holding that, having decided in the companion case that the government could be sued for contribution in an independent action, such right could be enforced by way of third-party complaint, and that the third-party practice provided for by Rule 14 was applicable to suits against the United States. In United States v. Muniz, 374 U.S. 150, 166, 83 S.Ct. 1850, 1859, 10 L.Ed.2d 805, 817 (1963), the Court reaffirmed its holding in Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L. Ed.2d 354, that "'[t]here is no justification * * * to read exemptions into the Act beyond those provided by Congress. If the Act is to be altered that is a function for the same body that adopted it'". The rule of strict construction is not one of narrow construction. The prevailing trend of decision is canvassed in City of Pittsburgh v. United States, 359 F.2d 564 (3d Cir. 1966):

> "Although at one time the doctrine of sovereign immunity had such vitality that a waiver of it was strictly construed (see United States v. Sherwood, 312 U.S. 584, 590, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)), the purpose of the Federal Tort Claims Act to permit those injured by the negligence of employees of the United States to recover damages to the same extent as if the United States were a private person expresses so strong a public policy that the statute has been deemed to be highly remedial and has received a liberal construction. [Citations omitted.] This overriding purpose, expressed in the statute, has provided the guide to the interpretation of the Act, and it has been applied in some circumstances where its literal language might have resulted in a restricted meaning. * * *

> [T]he view has ultimately prevailed that the United States may be sued by a subrogee of the injured party, by an indemnitee who has paid the injured party's claim, and that it may be joined originally with other defendants as a joint tort-feasor, and may also be impleaded as a third-party defendant to enforce contribution against it as a joint tort-feasor." 359 F.2d at 567. [Footnotes omitted.]

Strictly speaking, the permissibility of a class action under the Tort Claims Act does not require construction of the language of the Act, for it is silent on the question. In substance, the government asks the Court not to construe the Act strictly or narrowly, but to create a judicial exemption from it. Neither the plaintiff nor defendant have pointed to any real increased procedural burden upon the government resulting from the defense of a class action.

Given the remedial purpose of the Tort Claims Act, and indeed of the Tucker Act, the application of Rule 23 to actions thereunder against the United States seems particularly appropriate. As stated in Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2nd Cir. 1968):

> "Class actions serve an important function in our judicial system. By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress for claims which would otherwise be too small to warrant individual litigation." 391 F.2d at 560.

Quoting academic commentary on the device, the court in Dolgow v. Anderson, 43 F.R.D. 472, at 484 (E.D.N.Y.1968) noted that the class action is "particularly appropriate where those who have allegedly been injured 'are in a poor position to seek legal redress, either because they do not know enough or because such redress is disproportionately expensive.'" The instant cases are excellent examples, where only an ex-

ceptionally circumstanced landowner could afford the lengthy, extensive and costly preparation and litigation involved.

Given the silence of either the Tucker Act or the Tort Claims Act on the propriety of class proceedings, the absence of any apparent substantial burdens sustained by the government in defending such actions, the economy of litigation achieved thereby, and the enhanced access of small claimants to legal redress against the government, we hold that jurisdiction does not fail under 28 U.S.C. § 1346(a)(2) and (b) because plaintiffs have sued as a class.

One question remains concerning jurisdiction under the Tucker Act, which confers jurisdiction over a "civil action or claim against the United States, not exceeding $10,000 in amount, * * *." If the stated jurisdictional limit for actions against the United States in the district courts under the Tucker Act applies to the entire sum sought to be recovered from the government in the action, then jurisdiction for plaintiffs' claim under the Tucker Act lies only in the Court of Claims. If the jurisdictional monetary limit applies only to the claim of each individual plaintiff, we have jurisdiction of all claims not exceeding $10,000. No authority is cited on this issue, and independent research discloses none. We hold for the reasons set forth above that the jurisdictional monetary limit applies to the claim of each member of the class and we therefore have jurisdiction over the claims not exceeding $10,000 asserted under the Tucker Act.

As indicated, supra, plaintiffs have commingled two theories in their claim under the Tucker Act, claiming standing thereunder first as third-party beneficiaries of the contracts of the United States with each of the helium extraction companies, and secondly, as owners of property acquired by the government by exercise of its powers of eminent domain without paying just compensation therefor.

Each of the contracts upon which plaintiffs rely provides that if the vendor of helium is required to make payments to other persons for helium extracted by them and sold to the United States, or for the acquisition of helium in natural gas, the United States will reimburse each for such amounts, with the companies themselves bearing approximately the first $3.00 per Mcf of the costs of such reimbursement. The obligation of the United States runs only to its contractors, and payments are required to be made only to such companies in the amounts those companies themselves have paid, less approximately $3.00 per Mcf. Payments by the United States to any one of its contractors under these reimbursement provisions are triggered, as it were by first, a determination of the company's liability to persons found to be entitled to such compensation for the helium, and secondly, by actual payment therefor. The need for adjudication of liability may be waived by the United States, by consenting to such payments. Once these conditions are met, the obligation of the United States runs only to its contractors. The entire scheme of the contracts precludes the direct action against the United States.

A mere promise to indemnify against damages does not constitute a contract for the benefit of third persons which a party claiming damages may enforce directly against the indemnitor, "Here the promisor's liability does not arise until the promisee has suffered loss or expense. Until then the promisee has no right of action, and consequently one claiming damages can assert no derivative right against the promisor, much less a direct right." 2 Williston on Contracts § 403 (3rd ed.) "An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee." Restatement of Contracts, § 147.

We conclude that plaintiff landowners are but incidental third-party beneficiaries, and as such lack standing to main-

tain their Tucker Act claim on this ground.

The balance of their claim thereunder must be founded "upon the Constitution, or any Act of Congress, or any regulation of an executive department * *." Plaintiffs allege that the government's acquisition of helium constitutes an exercise of its powers of eminent domain. "When the United States takes property for public use and without just compensation as required by the Fifth Amendment, the owner may sue under the Tucker Act." United States v. Wald, 330 F.2d 871 at 872 (10th Cir. 1964). An actual taking must be established. Once found, the suit becomes in effect a condemnation action in reverse. Landowners must establish such a taking, as a jurisdictional prerequisite to maintenance of their Tucker Act claim, or the same must be dismissed for want of jurisdiction.

## THE GEOGRAPHICAL AREA

The helium giving rise to the funds in these interpleader cases and the suits against the United States is contained in natural gas produced from an area denominated the Hugoton Gas Area, which lies in parts of three states, Texas, Kansas, and Oklahoma.[69] The area covers approximately 210 miles from north to south, 160 miles from east to west, and covers approximately 33,000 square miles and over 21 million acres. The area comprises six principal gas fields. The Kansas Hugoton Field lies in eleven Kansas counties in the southwestern part of the state: Hamilton, Kearny, Finney, Gray, Haskell, Grant, Stanton, Morton, Stevens, Seward and Meade. The Guymon Hugoton Field lies in Texas, Beaver, and Cimarron counties in Oklahoma. The Texas Hugoton and East and West Panhandle Fields lie almost wholly in the northernmost

three tiers of counties twelve in all, of the Texas Panhandle.[70]

Fields within this geographical area from which natural gas is produced but not processed for helium extraction by interpleading plaintiffs, include, among others, the Cliffside Field in Texas, the Keyes Field in Oklahoma, and the Greenarea outlined above contains approxiwood Field in Kansas.

The gas underlying the geographical mately fifteen per cent of the known natural gas reserves of the United States. It is, according to some testimony, the largest single pressure-connected gas reservoir in the world. It serves approximately fifteen million domestic and industrial consumers. Most important for this litigation, these fields were estimated, as of the mid-1950's, to contain ninety-nine per cent of the economically recoverable helium in the United States, totalling approximately 119 billion cubic feet of helium from estimated resources of a total of 36.4 trillion cubic feet of gas.[71]

Commercial gas production of natural gas from the Hugoton Fields began a half century ago with the completion of the first well, located in the Texas Panhandle, in 1918.[72] The first gas well in Kansas Hugoton was completed in 1922, near Liberal, and the discovery well of the Guymon Hugoton (Oklahoma) was completed in 1922. The generally-regarded discovery well of the Kansas Hugoton was completed in 1927.[73] Development of the fields in terms of wells completed was relatively slow until the late 1920's and early 1930's, when pipelines were first extended into the area, thus making accessible widespread industrial and consumer markets.[74] Development accelerated after World War II, with the further expansion of pipelines through the area, to transport gas

---

69. There is some contention that parts of Colorado comprise the Hugoton Area or Field. If so, we have no indication of Colorado gas wells being involved in these proceedings.

70. LOX 791; Helex Ex. 36 (See Maps).

71. LPX 53, p. 1; LPX 56, p. 10.

72. Gensch Tr. 2:128.

73. Gensch Tr. 2:130.

74. Helex Ex. 37.

to more widespread fuel markets. The geographical productive limits of the fields expanded gradually until in 1941, the Kansas Corporation Commission first defined the limits of the Kansas Hugoton Field.[75] The Guymon Hugoton Field was first defined by the Oklahoma Corporation Commission in 1945.[76] The Texas Panhandle Fields, East and West, developed earlier, and not until 1945 did the number of wells in the Hugoton Fields of Texas, Oklahoma and Kansas equal those in the Panhandle Field.[77] From the completion of the first well in 1918 through 1965, more than 15,000 gas wells were drilled in this area.

The development of these fields is reflected in the incidence of leasing activity, which shows that over 85 per cent of the leases outstanding in Kansas were taken since 1940; that over 75 per cent of the Oklahoma leases were taken after 1940; and that in Texas, where drilling and leasing activity commenced earlier, 65 per cent of the outstanding leases canvassed were taken in 1941 and thereafter.[78] Wells were drilling in the Hugoton gas area as follows :

### Cumulative Total Wells

| | Panhandle Field | Hugoton | | |
|------|-----------------|------|------|-------|
| | | Kan. | Okl. | Texas |
| 1924 | 29 | 1 | — | — |
| 1929 | 444 | 8 | 3 | 4 |
| 1934 | 856 | 142 | 8 | 4 |
| 1939 | 1435 | 282 | 28 | 6 |
| 1944 | 1763 | 403 | 172 | 16 |
| 1949 | 2338 | 1848 | 760 | 367 |
| 1954 | 3010 | 3317 | 1339 | 838 |
| 1959 | 3841 | 3891 | 1378 | 932 [79] |

## HELIUM AND NATURAL GAS

The presence of helium in natural gas was first discovered in 1905, by two University of Kansas professors, Cady and McFarland, who analyzed a sample from a gas well at Dexter, Kansas, drilled and completed in 1903, and discovered it to contain 1.84 per cent helium, with minute quantities of two other inert gases, neon and argon. This gas had a relatively low British thermal unit (Btu) [80] content, under 500 Btu, and was a relatively inefficient fuel gas.

Helium is contained, in either measurable or detectable quantities, in gas found in the majority of natural gas fields in the United States. In 1918, the Bureau of Mines commenced a program of gas analyses of samples collected from fields over the nation. The first report of analyses collected thereunder was published in 1921; that report discloses the presence of helium in either trace or measurable quantities, in virtually all of 183 samples collected from Texas, Oklahoma and Kansas.[81] Since that time, approximately 5800 gas samples have been analyzed and reported in Bureau of Mines information bulletins and circulars, representing 3,008 gas fields in 33 states in this country from which commercial gas production has been ob-

75. LOX 791; Gensch Tr. 2:151–152.

76. Gensch Tr. 2:151–153.

77. Tr. 46:4484.

78. LOX 794; Tr. 6:428 et seq.

79. Helex Ex. 37.

80. The amount of heat required to raise the temperature of one pound of water one degree Fahrenheit at 39.2°F.

81. LOX 6.

tained. Over 95 per cent of these samples contained helium in trace or measurable quantities.[82] Of an additional 947 samples subsequently reported, only two contained no helium.[83] Thus, the presence of helium has been detected or measured in natural underground gas reservoirs throughout the greater part of the United States.[84]

The presence of helium in natural gas has not been a secret to which the Bureau of Mines has been the only privy party. Reports of gas analyses conducted by it were furnished the well owners, producers, and other persons providing samples, and commencing in 1928, helium was reported as a separate constituent in those analyses, although prior to that time it had been reported as part of the nitrogen content of gas. As indicated above, the first publication of gas analyses showing the presence of helium was dated 1921, a professional paper numbered 121, titled "Helium-Bearing Natural Gas," by G. Sherburne Rogers.[85] There have been other publications in the United States.[86]

The constituents of natural gas found in underground reservoirs in the Hugoton area include hydrocarbon compounds, ranging from methane, the compound lightest in molecular weight but lowest in Btu yield, through ethane, propane, normal butane, iso-butane, normal pentane, iso-pentane, and various heavier hydrocarbons. Non-hydrocarbon constituents include nitrogen, oxygen, argon, helium, hydrogen sulfide, hydrogen, and carbon dioxide. Gaseous hydrocarbons comprise by volume approximately 85 per cent of the natural gas in the Hugoton fields; the non-hydrocarbon constituents enumerated above comprise the remaining 15 per cent. Helium alone comprises, on the average, about four-tenths of one per cent of Hugoton area gas, by volume.

The composition of gas from separate wells in the Hugoton area is by no means constant. Methane, e. g., ranges from a low of 45.9 per cent to a high of 82.6 per cent; nitrogen from a high of 44.3 per cent to a low of 6.5 per cent. Helium ranges from a low of .22 per cent to .97 per cent of the total stream.[87] No gas exists in the Hugoton reservoirs which does not contain non-hydrocarbon constituents.[88]

The separate constituent components of gas in a given reservoir, and in the Hugoton area, are found in a state of random molecular diffusion; that is, separate molecules of the hydrocarbon compounds and the non-hydrocarbon elements and compounds are randomly mixed within any given pressure-connected reservoir. The diffusion may not be perfect, so that a given field, or a single well with a field, will yield a gas stream of constant and unvarying composition. Helium itself is diffused within the Hugoton area; its rate of diffusion within a single reservoir may vary among separate vertical zones, depending upon its rate of diffusion through horizontal layers of shale separating separate gas zones.[89]

Although found together within the Hugoton Field, and in many gas reservoirs gaseous hydrocarbons and helium originate through separate processes and they may or may not derive from the same physical source beds. Hydrocarbons are generally thought to originate from chemical breakdown and reorganization of organic animal and vegetable materials deposited on the floor of pre-historic oceans overlying the Hugoton area. Helium is thought, according to the prevailing theory, to be radiogenic, that is, to have resulted from the decay or degeneration of uranium into lead, the breakdown yielding helium atoms during the process. The source beds of helium and hydrocarbon gases are frequently

82. Helex Ex. 12.

83. Helex Exs. 282–283.

84. Helex Ex. 14.

85. LPX 6.

86. Helex Ex. 12.

87. Helex Ex. 18.

88. Ibid.

89. Tr. 42:4216 et seq.

identical, although there is no necessary relationship between the two. The presence of helium and gaseous hydrocarbons within the same reservoir results from their property as gases to migrate through or into porous and permeable subterranean formations.[90]

Helium has never been produced from a gas well separately and apart from the total stream of raw natural gas as it emerges from the wellhead. Other than the removal of liquefiable hydrocarbons through conventional mechanical or low temperature separators, it is economically impossible to separate the constituents of the gas stream at the wellhead, and no practical or economically feasible means has been devised to date for the wellhead separation of helium from the balance of the gas stream. Thus, the composition of the natural gas stream as it is produced at the wellhead necessarily reflects the composition of the reservoir gas.[91]

The production of natural gas from underground reservoirs is accomplished by reservoir pressure, specifically, the difference between reservoir and wellhead pressure causes gas to flow through the well bore. The stream must necessarily be produced in its entirety, and with all the gaseous constituents randomly commingled in the stream as found in the reservoir.[92]

### HELIUM EXTRACTION PRIOR TO 1960

The only extraction and marketing of helium prior to 1960 except as hereinafter noted was accomplished by the United States. It acted through its Bureau of Mines in the Department of the Interior, which has been charged by statute with helium research and development since 1925.

The first large-volume use for helium was discovered during World War I, (1917–1918) when it was found useful for inflation of lighter-than-air craft,

particularly dirigibles. Prior to that War, helium had been extracted from natural gas in only very small amounts, for laboratory purposes. The first large volume extraction was done in two plants built at Fort Worth, Texas, early in 1918, known as Experimental Plants No. 1 and 2. A third plant, Experimental Plant No. 3, was completed and started in late 1918, at Petrolia, Texas, approximately 100 miles north of Fort Worth.

The next plant, Production Plant No. 1, was constructed at Fort Worth, Texas. Each of these plants was constructed by private firms operating under contract with either the Department of the Navy, the Bureau of Mines, or both.

Natural gas for helium extraction was furnished for these plants by the Lone Star Gas Company, a producer of gas from the Petrolia Field and a distributor in Fort Worth.[93]

The next production plant, Production Plant No. 2, was designed and built by the Bureau at Fort Worth, Texas. Although World War I concluded before helium produced in these plants could be used, production continued at Fort Worth until depletion of the Petrolia Field in 1929.

Faced with approaching depletion of that field, on May 17, 1927, the United States acquired an option for a period of two years to purchase leasehold rights in the Cliffside Field in Potter County, Texas, owned by the Amarillo Oil Company, a producer, pipeline company, and distributor of natural gas in the Amarillo area. Also on that date, the company contracted to sell and deliver natural gas to a helium extraction plant the Bureau intended to construct at Amarillo.[94]

The United States thereafter undertook to acquire both leasehold and retained royalty rights in the Cliffside Field in order to control production therefrom, to avoid pressure to increase production from royalty owners, to be

90. Ibid.

91. Tr. 47:4545.

92. Tr. 37:3719.

93. LPX 200, 201; Helex 23, Part. 1.

94. LPX 202.

free to shut in production when helium demand decreased in order to avoid the production of any gas not processed for helium extraction. Accordingly, in 1929, the United States exercised its option and began the acquisition of Amarillo's leasehold rights in the field,[95] acquiring the company's gas rights in approximately 26,000 acres of the 50,000 acre field. Leases held by Amarillo were given by W. H. Bush, the Fuqua Land & Cattle Company, and Lee Bivins. The United States acquired the Bush lessor interests by a Gas Grant dated July 19, 1930;[96] the Fuqua Land & Cattle Company interests by contract of sale dated April 17, 1930;[97] the Bivins interests by condemnation proceedings in the United States District Court for the District of Texas, covering "retained gas royalty rights" held by the Bivins heirs.[98] One heir of the Bivins estate claimed that the Bivins gas lease did not convey helium. This claim was rejected by the Commerce Department, and the condemnation of "gas rights" was completed, without mention of helium as a separate constituent of the gas.

By purchase or condemnation, the United States obtained lessors' retained gas in the balance of the field, gas rights to lands not under lease, and fee title to other property in the field, so that by 1933, the United States owned all gas rights in the Cliffside Field. Representative copies of oil and gas leases covering the field contain typical grants of "oil and gas" or "oil and gas, casinghead gas, casinghead gasoline."[99] Helium as such is not mentioned in any of the leases.

The only private firm to extract and market helium as a separate commodity prior to enactment of the Helium Act Amendments of 1960 was the Girdler Corporation. It operated two extraction plants, one at Dexter, Kansas, and one at Thatcher, Colorado (Model Dome). It operated these intermittently between 1927 and 1934. Gas for processing in these plants was supplied by production under leases in the plant vicinity held by Girdler itself.[100] The gas processed at Thatcher was almost wholly noncombustible, containing 85 per cent nitrogen, seven per cent helium, and seven per cent carbon dioxide. By amendment in 1937, Ch. 895, 50 Stat. 885, to the Helium Act of 1925, Ch. 426, 43 Stat. 1110, the Secretary of the Interior was directed to purchase, if possible, all properties developed or constructed by private parties for helium production prior to passage of the amendment, September 1, 1937. The Girdler plants comprised the only private helium extraction operation in the country at that time, and were purchased by the United States in 1938. They were not at that time in operation, and had not been for approximately four years. The 1937 amendment did not forbid subsequent commercial helium extraction and marketing by private companies. No private firm or corporation undertook these ventures, however, until after the Helium Act Amendments of 1960.

At the commencement of World War II, thus, all helium extraction facilities were owned by the United States, and consisted solely of the Amarillo Plant. It constructed four plants during World War II, to meet the greatly increased helium demand for military requirements. The first was constructed at Exell, Texas, in 1943. Gas for both plant fuel and for helium processing was supplied from the Channing area of the West Panhandle Field under a contract of the United States with the Canadian River Gas Company (merged in 1951 into the Colorado Interstate Gas Company).[101] Wells supplying this production were drilled under a single lease

95. LPX 203.

96. LPX 11.

97. LPX 10.

98. LPX 15.

99. LPX 216(b).

100. LPX 216(c) (d).

101. LPX 207.

granted by Lee Bivins dated May 1, 1923 covering "Oil and gas" in a 200,000-acre area.[102]

Later in 1943, the United States completed a second plant, at Otis, Kansas. Natural gas was furnished this plant, for both fuel and for helium extraction, from several small area fields under contracts with the Producers Gas Company and Northern Natural Gas Company.[103] Additional supplies of gas were furnished by the Kansas-Nebraska Gas Company under a 1952 contract, supplying gas produced in Barton and Rush Counties, Kansas.[104] The third plant to be constructed was near Cunningham, Kansas, completed in 1944, gas again for both fuel and for helium extraction being supplied by the Skelly Oil Company from the Lyons Field.[105] Again, this gas was produced under typical leases of oil and gas.[106]

The last plant built by the United States to meet wartime needs was at Shiprock, New Mexico, known as the Navajo Plant, completed in March, 1944. Helium-bearing natural gas was first furnished this plant from a well named Rattlesnake 1-G, drilled by the Continental Oil Company under a 1923 lease granted by the Navajo Tribe, which conveyed to their original grantor "oil and gas deposits" in the described property and formations. Through a series of agreements,[107] the United States subsequently acquired the lessees' interest as to certain formations under that lease, and became itself a lessee-producer of helium-bearing natural gas under the 1923 lease. This lease was construed in Navajo Tribe of Indians v. United States, 364 F.2d 320, 176 Ct.Cl. 502 (1966).[108] This gas contained 7.6 per cent helium, and was non-combustible due to a high nitrogen content.

The Navajo Plant was operated initially for only 18–19 days. Later, operations indicated the Rattlesnake supply was inadequate, and the United States entered into a number of later contracts for helium-bearing gas for processing. By 1955, the Rattlesnake Field having become depleted, the United States contracted with the Stanolind Oil & Gas Company (now Pan American Petroleum Corporation) for gas produced from what is identified as the Hogback Field in San Juan County, New Mexico.[109] It executed the next contract in 1959 with the Pan American Petroleum Corporation covering gas produced from the Navajo C-1 well.[110] It executed a gas supply contract for the Navajo Plant in 1962 with the Continental Oil Company, covering gas produced from the Table Mesa Field.[111]

The production of helium reached a wartime high of over 137 million cubic feet in 1944.[112] Immediately after the war, production dropped to approximately 63 million cubic feet in 1946, and later dropped still further to 54 million cubic feet. Accordingly, after the war, all government plants were closed except that at Exell, Texas. Excess production of helium from Exell was first stored in 1945 in the government-owned Cliffside reservoir. The Cunningham Plant was dismantled, and the remainder were placed on standby status.

Helium demand again commenced to increase in 1950, and the government plants at Amarillo, Otis, and Shiprock were placed back in operation in 1950, 1951, and 1953 respectively. By 1952, government production reached and exceeded the previous high of 1944. In 1957, to meet the rising demand, the capacity of the Exell Plant was enlarged from 60 to 240 million cubic feet, and

102. LPX 216(e).

103. LPX 208, Helex 27; LPX 209, Helex 26.

104. LPX 211; Helex 28.

105. LPX 210; Helex 29.

106. LPX 216(g).

107. LPX 27.

108. See our discussion infra, page 662.

109. LPX 212; Helex 30.

110. Helex 31; LPX 214.

111. LPX 215; Helex 230.

112. LPX 112.

the government thereafter undertook the construction of the last government-owned helium plant, at Keyes, Oklahoma. It was placed in operation in 1959. Gas for this plant was supplied by the Colorado Interstate Gas Company under a contract executed April 4, 1958.[113] It was to be produced from the Keyes Field in Oklahoma.

The contracts recited above comprise all of the gas purchase contracts in this country under which natural gas was purchased by the United States with the express contemplation that helium would be removed from it. No portion of the price to be paid for natural gas was separately and expressly attributed to its helium content until the 1958 Keyes contract. The prices in all contracts prior to 1958 were the prevailing market prices for natural gas for fuel markets at the time of their execution. The Lone Star contracts supplying Experimental Plant No. 3 and Production Plant No. 1 at Fort Worth, Texas provided identical prices, though stated separately, for shrinkage resulting from the removal of helium, and shrinkage resulting from the use of gas for fuel, fifteen cents per Mcf. Contracts executed to supply the wartime plants at Exell, Texas, and at Otis and Cunningham, Kansas, all provided for payment of either seven or eight cents per Mcf for all gas processed and not returned after the extraction of helium. This total shrinkage was composed of not only the helium removed, but gas used for the generation of power and heat, i. e., fuel, hydrogen sulphide removed in the extraction process, and all other gas lost within the plant. Three of the four contracts supplying these plants recited the following respecting the extraction of helium:

"WHEREAS, the processing of gas for helium extraction tends to improve its composition for use as fuel, because such processing not only removes the greater part of the helium, which has no fuel value, but also re-

moves some portions of other inert gases contained in the helium-bearing gas * * *." [114]

The 1955 Stanolind contract supplying the Navajo Plant, covering gas from the Hogback Field containing 7.5 per cent helium by volume, provided for payment of twelve cents per Mcf plus a three cent delivery charge. This gas was not efficient fuel gas, and contained about 450 Btu's.

It was in the 1958 Keyes contract, with Colorado Interstate Gas, that the United States agreed for the first time to a payment for helium-bearing gas on a basis other than solely for the volume of gross shrinkage in the plant.[115] The price was divided into two parts, a payment of 26 cents per Mcf for "all gas consumed in the plant as fuel and for all shrinkage resulting from processing in the plant," and in addition a four cent per Mcf fee denominated a "Processing Fee:"

"6.2 *Processing Fee*—As compensation to the company for gas processing and helium extraction rights, and for providing gas deliveries at suitable pressure, volume, and helium content, *and for the helium extracted*, the United States shall pay the Company a gas processing fee on the total volume of gas delivered to the helium plant and processed for helium extraction. Said processing fee shall be 4 cents per thousand cubic feet for gas having a weighted average helium content of 2.0 per cent during the billing period. * * *." [Emphasis supplied.] [116]

The contract provides further that "[i]f the weighted average helium content for the billing period is greater or less than 2.0 per cent, the processing fee shall be increased or decreased in accordance with the table attached hereto * * *" The average helium content of Keyes gas is two per cent by volume. This processing fee applies only to gas coming into the plant which is processed for helium re-

113. LPX 213; Helex 32.

114. LPX 208, (Example).

115. LPX 213; Helex 32.

116. Ibid.

moval, and is not paid when gas entering the plant is not so processed and is used merely for power.

At the time this contract was executed, Colorado Interstate purchased gas in the Keyes Field from some twenty-six companies or individuals, at a wellhead price approved by the Federal Power Commission (FPC) of fifteen cents per Mcf, which was adjusted due to low Btu content to twelve cents per Mcf, upon which royalties were paid.[117] In addition, Colorado Oil and Gas Company, a wholly-owned subsidiary of Colorado Interstate, owned approximately one-half of the leasehold interests in the field, and Colorado Interstate paid this subsidiary the 12 cents adjusted price. Thus, for gas sold to the United States and used by it, Colorado Interstate paid, at the time the contract was executed, 12 cents per Mcf at the wellhead, and received 26 cents per Mcf for the gas used by the United States.

It is disputed whether the additional four-cent "processing fee" constitutes a payment for helium. Dr. Seibel, then with the Bureau of Mines, stated that the processing fee covered a "number of items which the government felt were quite valuable," including a guarantee of ownership of helium, a limitation on daily gas withdrawals from the field, obligations of the seller to minimize dilution of the helium content of the gas, an agreement to maintain fixed delivery pressure at the plant inlet regardless of variations in field pressure, and the exclusive right to process all Keyes gas for helium extraction.[118] Mr. Henry Wheeler of the Bureau of Mines characterized this fee thus:

"In effect, this four cent processing fee assigns a market value of $2.00 a thousand cubic feet. Whether it was intended to do that or not that is initially what we got for the four cent processing fee, helium at $2.00 a thousand cubic feet." [119]

The two-dollar figure mentioned above does not appear in the Keyes contract. It may, however, be calculated therefrom. The Keyes gas constitutes two per cent helium by volume. To obtain one thousand cubic feet of helium, thus, it is necessary to process 50,000 Mcf of gas. The processing fee for that quantity, at four cents per thousand cubic feet, equals two dollars. In other words, the contract requires that the United States pay the company $2.00 for the right to process sufficient gas to yield one thousand cubic feet of helium.

The next contract following the Keyes agreement was executed by the United States with Pan American on June 12, 1959, supplying natural gas with about 5.6 per cent helium by volume, to the Navajo Plant.[120] It provided for payment as follows:

"10.1 The price of gas delivered and sold by Company to the United States during the terms and under the conditions of this agreement, shall be nineteen (19) cents per one thousand (1,000) cubic feet which price is made up of the following:

| | |
|---|---|
| Helium | 11.6 cents |
| Hydrocarbons | 1.8 cents |
| Delivery | 5.6 cents |
| | 19.0 cents" |

Mr. Wheeler of the Bureau testified that this attribution of 11.6 cents to the helium content of the gas was based upon the "formula" established in the Keyes Plant: that the value of two cents per one per cent of helium content was applied to a gas containing 5.8 per cent helium, resulting in a price of 11.6 cents per Mcf.

The two dollar figure referred to as the "Keyes formula" has been considered in the United States contracts with the Helex companies. The formula is discussed in connection with our analysis of such contracts.

117. LOX 60.

118. Tr. 63:6038–6039.

119. Tr. 66:6310.

120. LPX 214; Helex Ex. 31.

## HELIUM CONSERVATION

Helium produced prior to 1960 was used primarily to meet current demands of both governmental and civilian users. These demands had risen sharply during the 1950's. From 1948 until 1956, helium sales increased five-fold.[121] This increase was due to the rapidly multiplying uses being developed for helium.

Its first large-volume use was as a lifting gas for lighter-than-air craft, commencing immediately after World War I. Prior to World War II, small but important quantities were also used in diving and submarine operations, and for medical purposes. During World War II, it became important in atomic energy and as a shield in arc-welding of such metals as magnesium, aluminum, and stainless steel. It is essential for much nuclear and cryogenic research, and its industrial applications are more numerous than ever before.

The conservation of helium was particularly a matter of federal concern. In 1955, 70 per cent of all helium produced by the Bureau was used directly by federal agencies, particularly the Department of Defense and the Atomic Energy Commission. At that time, projects involving over $6,000,000,000 were estimated to depend upon continued helium supplies. Over half of the remaining 30 per cent was used by private purchasers in work under government defense and atomic energy contracts.

As increasing helium demands threatened to outstrip the production capacity of the Bureau, concern arose that sudden defense mobilization requirements could not be met, and attention turned to both providing increased production capacity and the use of other helium sources, including the Hugoton and Panhandle Fields. A 1953 report

of the Office of Defense Mobilization reported that in 1952, "more than seven million cubic feet of helium a day was going out of the western part of the Texas Panhandle Field in nine pipelines. * * * "[122] Further,[123] a report prepared in 1954 for the Bureau of Mines by a private engineering firm, called the Stone & Webster Report, was concerned primarily with developing adequate reserves and production capacity to meet any sudden military demand.[124] By 1956, the concern for helium was twofold, both to meet mobilization needs and to conserve an increasingly valuable and wasting natural resource.

Helium carried in natural gas to fuel markets does not burn, of course, and simply passes into the atmosphere at the burner tips. It constitutes approximately 1/200,000th part of the atmosphere and no economical method has been developed for its recovery from the air. Carried in the natural gas, it produces no heat. Moreover, it reduces the Btu yield of a gas stream by absorbing heat itself, sufficient to raise its temperature to that of the burner. The 1954 Stone & Webster Report stated that under then current natural gas production schedules, approximately two-thirds of the helium supplies would be dissipated within the next twenty years.

In 1957, a helium policy "working group", headed by then Undersecretary of Interior O. Hatfield Chilson, was constituted to determine how a national preservation policy should be implemented, and its cost. In its report in 1958, referred to as the Chilson Report, that group concluded that the "only practical method of conserving the large volumes of helium currently wasted to the atmosphere is to construct and operate helium plants to extract the helium from heli-

121. LPX 43, Report prepared in 1956 by Dr. C. W. Seibel, then Asst. Director of the Bureau of Mines, in charge of helium, titled "Helium—Uses—Requirements—Production—Conservation—Costs," p. 2.

122. LOX 40, p. 12.

123. LOX 42.

124. LOX 42; See also a 1955 Bureau of Mines Report, "Helium—a Report for the Secretary of the Interior." LOX 47.

um-bearing natural gas before it is transmitted to fuel markets. * * * " [125] The basic plan of conservation was stated thus:

"Ninety-nine per cent of the known helium-bearing natural gas resources in the United States is concentrated in four fields: (1) the Hugoton field of Texas, Oklahoma, and Kansas; (2) the Panhandle field of Texas; (3) the Keyes field of Oklahoma; and (4) the Greenwood field of Kansas. All of these fields have been developed by private companies to supply natural gas to fuel markets, and they are presently being produced for that purpose. So far as the gas companies are concerned, the helium is a minor impurity, and no effort is made to remove it. Consequently, the helium is transmitted to fuel markets along with the rest of the gas, and it eventually passes through the gas burners into the atmosphere without serving any useful purpose.

"The Hugoton, Panhandle, Keyes, and Greenwood fields contain approximately 119 billion cubic feet of potentially recoverable helium. About 60 per cent of this helium could be recovered in 13 helium plants located at strategic points on pipelines leading from the fields. * * * " [126]

The report also suggested helium thus recovered could be stored at Cliffside until withdrawn and refined to meet current demands of the United States and private companies.

The role of private industry in any helium program to be undertaken was considered as early as 1954, in the Stone & Webster Report, in which it was discouraged as inconsistent with the United States' paramount interest in helium. Again in 1957, Dr. Seibel wrote that "[p]rivate industry participation in the direct production of helium at this time will jeopardize future supplies of the im-

portant strategic commodity—helium, cost the taxpayers many millions of dollars annually, require the establishment of a Government commission to regulate the industry and involve heavy subsidies." [127] In 1958, however, the Chilson Report recommended that private industry be given an opportunity to participate in the helium conservation program, but that a "completely private helium industry," resulting in promotion and sale of helium without regard to beneficial end uses, be avoided. Accordingly, it recommended that "the most satisfactory form of private participation would involve the purchase by the Government of all of the helium produced privately." [128] The Chilson Report was submitted to President Eisenhower and approved. The President thereupon promulgated a National Helium Conservation Policy, announced by the Secretary of the Interior on May 1, 1958. [129] In this press release, the Department stated: "Recovery of the helium from gas going to fuel markets will be accomplished in up to 12 plants, * * * to be constructed in or near the fields that produce the gas."

Thereafter in 1958, the Interior Department proposed legislation to Congress for the implementation of this conservation policy. This was not acted upon, and redrafted proposals were submitted again in 1959. With certain alterations, on September 13, 1960, the Helium Act Amendments were enacted, amending and replacing the Helium Act of 1925.

The 1925 Helium Act, Ch. 426, 43 Stat. 1110, was not itself a conservation act. It authorized the Secretary of the Interior "for the purpose of producing helium with which to supply the needs of the Army and Navy and other branches of the Federal Government * * * to acquire [helium-bearing] land or interest in land * * * where necessary, when helium can not be purchased from

125. LPX 56, p. 10.

126. LPX 56, pp. 10–11.

127. LPX 45.

128. LPX 56, p. 15.

129. LOX 81.

private parties at less cost * * *." The Act provided that all branches of the federal government could fill their helium requirements by purchases from the Bureau at "actual cost of said helium to the United States, including all expenses connected therewith * * *." The leasing of surplus helium to private parties was authorized. An amendment in 1927, Ch. 355, 44 Stat. 1387, authorized the sale or leasing of a maximum of 5,000 cubic feet of non-surplus helium annually to aid scientific and commercial development. In 1930, the Comptroller General issued a ruling requiring the Navy Department and perhaps all other federal branches, to meet their helium needs by purchases from the Bureau. By Act of September 1, 1937, Ch. 895, 50 Stat. 885, amending the 1925 Helium Act the Secretary of the Interior was directed "if possible under the terms hereof" to acquire all properties developed or constructed by private parties prior to that time for helium production. It was pursuant to this authority as we said that the Girdler Corporation plants were purchased by the United States. The 1937 amendments also authorized the sale of helium for medical, scientific, and commercial purposes which was not needed for government use, such sales to be at "reasonable prices * * * based upon the cost of acquiring, developing, maintaining, and operating the Government properties * * *." [130]

The 1960 Helium Act Amendments, 74 Stat. 918, 50 U.S.C.A. § 167 et seq., authorized the Secretary of the Interior to enter into long-term contracts for the acquisition, processing, transportation or conservation of helium, not exceeding twenty-five years. In addition, he was given the power to acquire, by eminent domain, helium contained in helium-bearing natural gas and so much of such gas as is necessarily removed in the extraction process, if he were unable to acquire helium otherwise upon reasonable terms and at the fair market value.

The Amendments provided a new basis for establishing the price of helium sold by the Bureau. Whereas under the 1937 amendment, the price was to be based on the actual cost of helium to the United States, including all expenses connected with its production, the new price under the amendment was to be adequate to recover, within twenty-five years, all funds expended in the entire conservation program. This price was subsequently set by the Secretary at $35.00 per Mcf, the price at which helium is sold to both federal and non-federal users. The Amendments required that all contracts made by the Secretary for the purchase of helium from private plants contain provisions forbidding the sale of helium to any purchaser other than the United States at a price lower than the lowest price paid by the United States for helium produced from any private plant. The Amendments required further that all agencies of the federal government purchase their major requirements of helium from the Secretary, to the extent that supplies were readily available.

### UNITED STATES HELIUM CONTRACTS

In 1960, directly after enactment of the Helium Act, the Bureau of Mines began to solicit the interest of private industry.

The number of parties who were in positions which permitted them to participate in the conservation who had the financial ability to perform a large government contract, was necessarily limited. Participation required that the contractor have in his control or access to, large volumes of gas with sufficient helium content to permit economical extraction, and in addition, ownership of such helium-bearing gas streams, or at least the right to extract helium therefrom.

On October 11, 1960, the Bureau sent identical letters to 377 persons and firms who had indicated interest in the

---

130. See LPX 32, Fig. 4, for graph outlining charges for helium to both federal and non-federal users.

program.[131] On October 25, 1960, the Department promulgated guidelines by which proposals were to be evaluated.[132] The Bureau judged proposals on four criteria: how much helium conservation could the proposal assure, how soon would it be accomplished, the probable cost of such conservation, and the ability of the company to perform as proposed.[133]

Of fourteen proposals received by the government, twelve proposed to build and operate helium extraction plants.

After exploratory interviews with each of these twelve firms conducted by a five-man board constituted to evaluate and select companies for actual contract negotiations, four companies were selected on March 6, 1961, three being parties to these cases, Cities, Northern and Panhandle.

Negotiations with these firms led ultimately to execution of contracts with their respective helium extraction subsidiaries: with Helex, Inc. (now Northern Helex, Inc.) on August 15, 1961; with Cities Service Helex on August 22, 1961; with National Helium on October 13, 1961. On August 21, 1961, the Bureau renewed its request for proposals from private industry to be submitted by September 15. Phillips thereupon submitted a new or altered proposal, which led to contract executed November 13, 1961.

From the announcement of the program in May, 1958, through execution of the last contract implementing it, the Bureau of Mines and Interior Department issued a total of 11 press releases, announcing every major step toward implementation of the program.[134]

At no time during the formulation, promotion, or implementation of the conservation program did either the Bureau or the Department seek to discour-

age participation by any member or segment of the petroleum industry, including both pipeline companies and producing companies.

Lessee-producers allege that representatives of the Bureau of Mines commenced preliminary discussion and negotiations with Northern, Cities, and Panhandle and others controlling large volumes of helium-bearing gas, as early as 1958, long before enactment of the Amendments in 1960.

The evidence introduced to establish these negotiations [135] simply does not do so. Representatives of Northern and Cities consulted with the Bureau concerning the possibility of their participation.[136] No negotiation of contracts was conducted by the Bureau with any company prior to 1961, following public solicitation of proposals from private companies.

Lessee-producers complain of alleged pre-selection of sites for helium extraction plants. Commencing in 1956, discussions of alternative approaches to helium conservation within the Bureau contain repeated references to a projected twelve or thirteen plants, which could recover 60 per cent of the helium transported from the Hugoton area in natural gas carried to and wasted in the market. These sites were but recommendations, and no site selection was imposed upon any party seeking to participate in the program.[137]

Copies of a May 1, 1958, press release were sent to Cities Service Gas and Panhandle on May 6 after its issuance accompanying requests for gas samples and data regarding gas flows, pressures and seasonal variations in lines owned or controlled by these companies. The evidence discloses no preferential treatment given these or any other com-

131. Helex 170; Tr. 66:6347.

132. LOX 120; Helex 171.

133. LPX 91, App. 21.

134. Helex Exs. 59, 161, 166; LOX 117, 119, 120, 122, 127.

135. LPX 57, 73, 80, 117, 118, 127, 128, 129, 145, 146 and 173; LOX 84; Tr. 79:7571.

136. LPX 80, 117, 118.

137. Tr. 67:6376.

panies in announcement of conservation plans.

Helium which the United States purchases from each of the four extraction contractors is contained in a crude helium-gas mixture, which the contracts define as "the gaseous product resulting from the helium extraction operation * * * [and] comprised of helium predominately *together with other constituents of the natural gas.*" In actual operations, the delivered gas mixture consists of about 70 per cent helium and 30 per cent nitrogen. This gas mixture is transported through a small diameter pipeline to Texas, where it is stored in the Cliffside underground reservoir. When needed, it is withdrawn and refined, prior to sale to about 99.99 per cent purity.

The prices stated in the contracts apply only to the volumes of helium *contained in* the helium-gas mixture, and not to the mixture itself.

The contract with Helex, Inc., provided for an initial unit price of $11.24 per Mcf for helium contained in the crude helium gas mixture delivered to the United States. Northern Helex produces this helium mixture in a plant at Bushton, Kansas, on pipelines of Northern Natural leading from the Hugoton area, commencing operations in December, 1962.[138]

The Cities Service Helex contract provided an initial price of $11.74 per Mcf which price has risen, pursuant to adjustment provisions in the contract, to approximately $12.23 at the time of trial. This helium is extracted at a plant constructed in Grant County, Kansas, on pipelines of Cities Service Gas, leading from the Hugoton area, operations commencing in June, 1963.[139]

Under the National Helium contract the United States agreed to a price of $11.78 per Mcf of contained helium, which had risen to approximately $12.35 at the time of trial.[140] This helium is extracted at a plant at Liberal, Kansas,

located on pipelines of Panhandle leading from the area, commencing operations in July, 1963.

The contract with Phillips provided a price of $10.30, which, like the other contracts, is subject to escalation, although the present price is not disclosed. Helium sold thereunder is extracted in two plants, one in Sherman County, Texas and the other at Dumas, Texas, these commencing operations in December, 1962 and April, 1963, respectively.

Under each of these contracts, the United States is obligated to purchase the total helium production of each company for a period of twenty-two years, this obligation subject to the limitation that the United States' purchases are not required to exceed specified annual dollar maxima: $9,500,000 in the Helex contract; $9,100,000 in the Cities Service Helex contract; $15,200,000 in the National Helium contract; and $13,700,-000 under the Phillips contract.

The United States negotiated the above unit prices in each contract on the basis of costs comparable to those it would incur in a government-owned plant located at the same place and in the same circumstances, adding thereto those costs of doing business applicable only to private industry, the cost of taxes, insurance, and a return on private capital. As one of the costs of operating a government-owned plant, the United States included in its cost build-up a payment of $2.00 for helium contained in natural gas delivered at the extraction plant for processing.[141] This separation of two dollars of the unit price as applicable to the cost of helium contained in natural gas to be processed for its extraction does not appear in any contract itself. It appears only in evidence which reflects the manner in which the United States reached its own cost estimates to form a basis for actual contract negotiation. The figure reflects no more than the estimate of the Bureau of Mines of the cost it

---

138. LPX 105.

139. Tr. 74:7070; LPX 106.

140. Tr. 71:6789.

141. See, e. g., LPX 91, App. 33.

would probably incur, in the operation of its own extraction plant, to acquire helium extraction rights from a natural gas stream.

The contract unit price in each case is stated in two parts, Part One representing the cost of natural gas to the extraction company. [E. g. in the Cities Service Helex contract, it represents the "cost in the field of shrinkage and fuel gas," these being the "shrinkage in the volume of natural gas occurring as a result of the helium extraction process * * * and any such natural gas consumed as fuel * * *" A similar provision is contained in the National Helium contract.]

Part Two, the greater part of the price, represents the balance of the unit price. Respecting the total unit price, the contracts provide:

"Payment for the helium-gas mixture sold and purchased hereunder shall be calculated and made on the basis of the contained helium therein. The unit price specified herein represents only the value of the contained helium and is applicable only to such contained helium. For the purposes of this contract, no value has been ascribed to gaseous products other than helium in the helium-gas mixture sold and purchased hereunder. Notwithstanding the foregoing, it is expressly understood and agreed by both parties hereto that payment in accordance with this article shall constitute full and complete payment for helium, nitrogen, methane, and any and all other constituents of the helium-gas mixture." [142]

The two parts are based on separate adjustment scales, Part One on the basis of the extraction companies' cost of gas, and Part Two according to the wholesale price index, exclusive of food and farm products.

The question of title to helium arose during negotiations. In each contract, the seller warranted title to the helium-gas mixture, or agreed to indemnify and hold harmless the United States for all claims of ownership by third parties to said mixture. The ultimate cost each seller might have to bear as a result of failure of title is limited, however, by provisions that the seller be reimbursed by the United States for all payments made in satisfaction or settlement of ownership claims to helium, to the extent that such payments exceed approximately $3.00 per Mcf of helium.

The contracts provide, in addition, that should seller's title to helium fail and seller cannot perfect it, that the United States is entitled to terminate the contract and to purchase the extraction plant itself.

Two contracts are in evidence under which gas is acquired for the extraction of helium therefrom, in which the two-dollar figure derived from the Keyes formula actually appears as payment for helium, both executed in 1965. Under a "Gas Exchange Agreement" between Phillips and Pioneer Production Company, Pioneer delivered to Phillips certain volumes of raw natural gas produced from the West Panhandle Field, Pioneer granting to Phillips the right to process the gas for helium extraction in the following language:

"*Section 1.* Subject to the other provisions hereof, Phillips is granted the right to process all gas delivered to Phillips * * * and to remove any constitutents therefrom so long as the gas which Phillips redelivers at Delivery Point "B" complies with the specifications set forth in Section 2 * * *."

"*Section 2.* As total consideration for such processing rights Phillips agrees to pay Pioneer a price of two dollars ($2.00) per Mcf for the Helium contained in the raw gas attributable to the residue gas Phillips delivers at Delivery Point "B." [143]

So far as appears, this helium is subject to sale to the United States under Phillips' contract.

142. E. g., LPX 107, p. 9.

143. Helex Ex. 112, p. 4.

Likewise, under a gas sales agreement executed April 1, 1965, between Colorado Interstate Gas Company and Alamo Chemical Company, a wholly-owned subsidiary of Phillips, Colorado Interstate granted to Alamo the right to extract helium and liquefiable hydrocarbons, from gas produced principally from the Greenwood and Sparks Fields in Kansas. Alamo agreed to pay Colorado Interstate "Two Dollars ($2.00) per Mcf for the contained helium extracted and saved at the Greenwood Plant, as determined under Article VII hereof." [144]

The foregoing history and development of helium extraction from natural gas constitute basic facts which we must consider in determining landowners and lessee-producer contentions of their rights to the fund and landowners claims against the United States.

We turn to the Leases.

## THE LEASES

As indicated at the outset of this memorandum, both landowners and lessee-producers argue that the extraction companies have no right, title or interest in the helium contained in the helium-gas mixture delivered to the United States, or in any other non-hydrocarbon portion of that mixture. The landowners claim that helium did not pass to their lessees under the oil and gas leases by virtue of which natural gas has been and is being produced from their properties. The lessee-producers oppose this position, and urge that helium did in fact pass under those leases, but that it passed no further, i. e., that it did not pass to the pipeline companies under the gas purchase contracts by which they acquire natural gas from which helium is extracted.

 We turn first to the arguments of the landowners, most of which are based primarily upon the granting language of the leases. Prior to trial, Ashland moved for summary judgment on the issue that oil and gas leases convey helium as a matter of law. This motion was overruled, in order that the court might consider evidence bearing upon the intention of the parties. In Whitebird v. Eagle-Picher Company, 390 F. 2d 831 (10th Cir. 1968), the Court stated thus:

"The vital and primary issue * * turns upon the interpretation of the language of the leases. It has been observed that today's leases are generally both a conveyance and a contract and therefore, that it is 'more likely that a written lease is intended to be a complete and operative integration of agreement. [Footnote omitted].' 3 Corbin, Contracts § 587, at 508 (1960): 'Even when a contract has been fully "integrated" in the form of written words, those words never have a single, necessary, legally imposed meaning, unaffected by the other words and acts of the parties whether antecedent or subsequent. Those other acts and words are admissible in evidence, to discover both the meaning that one party intended and the meaning that the other party received.' Id. § 538, at 71. Therefore, although evidence which will vary, alter or contradict the express written provisions of the written leases cannot be considered, American Crystal Sugar Co. v. Nicholas, 124 F.2d 477 (10th Cir. 1941), evidence which aids in the interpretation of the leases' language and indicates the meaning the parties intended and received may be considered. [Citations omitted.]" 390 F.2d at 834.

Accordingly, the court has received and considered much evidence of the development of gas production in the Hugoton gas area, leasing and production practices, and of the composition of natural gas, much of which has been considered in foregoing sections. Such matters are properly considered under the Restatement of Contracts, § 230, which provides as follows:

"The standard of interpretation of an integration, except where it pro-

144. Helex Ex. 113, p. 26.

duces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to the integration by a reasonably intelligent person *acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration,* other than oral statements by the parties of what they intended it to mean." [Emphasis supplied.]

See Southwest Kansas Oil & Gas Co. v. Argus Pipe Line Co., 141 Kan. 287, 291, 39 P.2d 906, 909 (1935). We turn to the language of the leases themselves.

Representative forms under which each named lessee-producer produces helium-bearing natural gas have been compiled with tabulations of acreages covered thereunder. The parties have stipulated that these compilations and tabulations are correct as to the named lessee-producers.[145]

Many thousands of leases are involved herein, with over 150 different printed forms. Over seventy-five per cent of the leases have been executed since 1940. Leases held by named lessee-producers contain a total of fifty different granting clauses.[146] Six of these clauses are found in leases covering over ninety per cent of the acreage involved:[147]

| KANSAS AND OKLAHOMA LEASES | Percentage of Acreage |
|---|---|
| "oil and gas, casinghead gas and casinghead gasoline" | 69.688 |
| "oil, gas, casinghead gas, casinghead gasoline and all other gases and their respective constituent vapors" | 10.132 |
| "oil and gas" | 7.144 |
| "oil, distillate, gas, casinghead gas, casinghead gasoline and all other gases and their respective constitutent vapors" | 3.311 |
| | 90.275 |
| TEXAS LEASES | |
| "oil and gas" | 39.860 |
| "oil, gas and all other minerals" | 25.517 |
| "oil and gas, casinghead gas and casinghead gasoline" | 14.545 |
| "oil, gas, and all other minerals" | 14.168 |
| | 94.090 |

Leases covering 99.99 per cent of the acreage involved herein contain the words "oil" and "gas." This conjunction of terms forms the heart of landowners' argument.

Of the fifty different granting clauses, landowners regard only five as conveying helium as part of the gas granted therein:

"(21) oil, gas, sulphur and all other minerals (whether or not similar to those mentioned)."

"(22) oil, gas, distillate, condensate, uranium, thorium, salt, sulphur

145. "The number of leases on each lease form and the number of acres covered by each form are correctly stated and shown in the forms and statements filed in this action or related actions by named party lessee-producers. The unit designations, gas unitization agreements, pooling orders (or equivalent), gas division orders and stipulations of royalty ownership and the like attached to said statements are representative of the forms used by the respective parties submitting the same. Such forms and statements may be received in evidence in lieu of the introduction of each original instrument." (Pretrial Order, p. 11).

146. LOX 838; see also LPX 237.

147. LOX 838, Schedules II and III.

and all other minerals, whether similar or dissimilar to those mentioned."

"(44) oil and gas, including casinghead gas, casinghead gasoline, condensate, and all related hydrocarbons and including all products produced therewith."

"(48) oil or gas, or both, including, but not as a limitation, casinghead gas, casinghead gasoline, gas-condensate, (distillate) and any substance, whether similar or dissimilar, produced in a gaseous state."

"(50) oil, gas, gas condensate, gas distillate, casinghead gas, casinghead gasoline, and all other gases and their constituent parts and other minerals produced in connection with oil and gas operations hereunder." [148]

Their interpretation of these five clauses rests upon language therein which specifically covers all gaseous substances without regard to their similarity or dissimilarity to "gas" in the phrase, "oil and gas."

The word, "gas", has two different meanings with which we are concerned. As a general term used in a physicist's sense to describe a state of matter, it is defined typically as an "aeriform fluid having neither independent shape nor volume but tending to expand indefinitely." [149] It is also used to describe natural gas, which is defined typically in mining and petroleum industry glossaries as "a mixture of gaseous hydrocarbons found in nature. * * *" [150] Nothing in the history of the word "gas" itself supports the argument that it defines only gaseous hydrocarbons. The word "gas" was coined in the early 17th Century by a Dutch chemist, J. B. Von Helmont, from the Greek word "chaos" to signify a "spirit not capable of being coagulated." It later came to mean an "aeriform fluid" used synonymously with air, and was subsequently restricted to permanently elastic fluids such as oxygen and hydrogen, as opposed to vapors, such as steam. In the 19th Century, it became common parlance for a mixture of carbureted hydrogen used to give heat and light, i. e., artificial gas. Gas as used to define natural gas, did not appear as a dictionary entry until 1914, after which time natural gas was commonly described as combustible gas formed in and issuing from the earth's crust. The term, "natural", became affixed to gas to differentiate its superior fuel and illuminating qualities from artificial gas.[151]

Landowners' arguments that the term, "gas", as it appears in the leases is limited to gaseous hydrocarbons are fivefold. We treat each separately.

First, landowners argue that the Kansas Supreme Court has ruled, albeit by way of dicta, that helium is not conveyed by mere grant of "gas" and that this Court is bound thereby. In Gilmore v. Superior Oil Co., 192 Kan. 388, 388 P.2d 602 (1964), the Court stated:

"Construction of oil and gas leases containing ambiguities shall be in favor of the lessor and against the lessee. (2 Summers on Oil and Gas, perm. ed., § 372, p. 485; Stady v. Texas Company, 150 Kan. 420, Syl. ¶ 2, 94 P.2d 322). It is puzzling to understand why the above textwriter had such difficulty with this rule for the reason that the lessee of an oil and gas lease usually provides the lease form or dictates the terms thereof, and if such lessee is desirous of a more complete coverage of the marketing of oil, gas, liquid hydrocarbons, or even helium gas, which has recently been found to exist in the minerals underlying the vast Hugoton field, the lessee has the opportunity to protect itself by the manner in which it draws the lease. Much more could be said on this point but extension of

---

148. LOX 838, Schedule I.

149. LPX 241.

150. Ibid.

151. Tr. 12:1092 et seq.

the discussion would be pure dictum and of no benefit to the bench, the bar, or the oil and gas industry." 192 Kan. at 391, 388 P.2d at 605.

Conceding the foregoing is but dictum, landowners assert that this constitutes a clear and intentional statement by the Supreme Court of Kansas that an oil and gas lease does not convey helium unless it expressly so provides, citing Curtis Publishing Company v. Cassel, 302 F.2d 132 at 135 (10th Cir. 1962); Whitaker v. Texaco, Inc., 283 F.2d 169 at 174 (10th Cir. 1960); Jess Edwards, Inc. v. Goergen, 256 F.2d 542, 100 A.L.R. 2d 804 (10th Cir. 1958).

 In each of the cited cases, the court held that federal courts, in diversity cases, must follow a "clear and unequivocal exposition of the law" in state court decisions, and that the force of statements could not be disregarded merely because they were dicta, and not necessary to the decision, following Hawks v. Hamill, 288 U.S. 52, 53 S.Ct. 240, 77 L.Ed. 610 (1933). We do not, of course, question the rule. We cannot concede its applicability here. The cited statement from the *Gilmore* case is in no way a clear and unequivocal statement that the meaning of "gas" in an oil and gas lease is ambiguous as to the coverage of any gaseous constituent in the reservoir.

 Failing this, landowners argue that nonetheless, the word "gas" is ambiguous, and that such ambiguity must be resolved against the lessee. The alternative meanings alleged to constitute this ambiguity are the so-called "physicist's meaning" descriptive of a state of matter, and an alleged industry usage of the term "gas" to mean a mixture of gaseous hydrocarbons. Evidence offered to establish this usage simply failed to do so. Virtually no naturally-occurring gas in underground reservoirs exists in the entire Hugoton and Panhandle fields which conforms to this alleged usage. It was stipulated

that in all instances, the gas which comes out of the wells is a continuous uninterrupted stream of gas emanating from the wellhead and remains such during its transmission to the helium extraction plants of each plaintiff extraction company.[152] No natural gas company, pipeline or producer, in the Hugoton area handles any unprocessed natural gas which is a physically and chemically pure hydrocarbon mixture. We cannot accept, as an industry usage, a definition which is so remote from the realities of that industry.

We must find, therefore, that the word "gas" as it appears in oil and gas leases is not ambiguous by reason of the alternative meanings recited above. We would note that did such usage exist, there would be no reason to apply it to oil and gas leases. By landowners' own evidence, from a random sampling of 984 leases, it appeared that 65 per cent of the sample was taken by independent lease brokers, and not by representatives of the producing industry.[153]

 Thirdly, landowners rely upon the rule of *ejusdem generis*, whereby a general term in a series may be given a limited meaning by other specific words therein. "Oil", it is argued, is synonymous with petroleum, which means liquid hydrocarbons; it is followed in 99.99% of the leases by "gas", a term which, in its most general application, signifies any substance existing in a gaseous state regardless of composition. Being conjoined with oil, it cannot be held to have been used generally, but specifically, to convey only those gases similar to oil, i. e. those hydrocarbon compounds in a gaseous phase.

 This argument was raised and rejected in Navajo Tribe of Indians v. United States, 364 F.2d 320, 176 Ct. Cl. 502 (1966), wherein the court states:

"Plaintiff argues that, under the rule of *ejusdem generis*, the term 'gas' in the granting clause is limited to hydrocarbons, i. e., gases associated with

152. Dkt. 59, W–3009.

153. LOX 794; Tr. 4:284 et seq.

oil. We see no reason to apply *ejusdem generis* to a phrase such as 'oil and gas,' and plaintiff cites no authority for doing so." 364 F.2d at 327.

We likewise think the argument is without merit. The word "oil" used in its ordinary, common, general and popular sense in oil and gas leases refers to crude oil as it is produced from the mouth of the well. See Hammett Oil Co. v. Gypsy Oil Co., 95 Okl. 235, 218 P. 501, 34 A.L.R. 275 (1921). There is no evidence that crude oil is a physically and chemically pure mixture of hydrocarbon compounds. That oil, in the sense of petroleum, for which landowners contend, is a mixture of hydrocarbons and other substances is a fact of which the court may take judicial notice. Petroleum is defined in Webster's Third New International Dictionary as follows:

"1: An oily flammable bituminous liquid that in the crude state often has a very disagreeable odor and may vary from almost colorless to black but is usu. of a dark brown or greenish hue and sometimes fluorescent, that occurs in many places in the upper strata of the earth either in seepages or in reservoir formations from which it is obtained by drilling and pumping if necessary, that is essentially a complex mixture of hydrocarbons of different types with small amounts of other substances (as oxygen compounds, sulfur compounds, nitrogen compounds, resinous and asphaltic components, and metallic compounds), that is sometimes classed as paraffin-base, asphalt-base or naphthene-base, or mixed base * * *

2: any of various substances (as natural gas or shale oil) similar in composition to petroleum."

We must conclude, first, that resort to the rule of *ejusdem generis* is neither appropriate nor justified to determine the meaning of the word "gas", and secondly, were it properly applicable, the term "oil" provides no limitation upon the kinds of gases conveyed under the leases.

Moreover, the rule of *ejusdem generis* is but "merely a phase of the more general rule that the contract must be interpreted as a whole," and "frequently must yield to other more pressing considerations." 3 Corbin on Contracts, § 552. Literal application of the rule was sought in In re Estate of Trester, 172 Kan. 478, 241 P.2d 475 (1952), to include clay with a grant of "oil, gas and other minerals." The Court rejected this argument:

"It is true that in classifying things as animal, vegetable and mineral, everything that goes to make up the earth comes within the general classification of minerals. But this general classification cannot be used for the interpretation of instruments granting specific rights. With respect to that matter the term 'mineral' is not a definite one capable of universal application. It is susceptible to limitations according to the intention of the parties using it, and in determining its meaning in a specific instrument not only the language of the instrument in which it occurs but also the relative positions of the parties interested and the substance of the transaction which the instrument embodies must be taken into account." 172 Kan. at 482–483, 241 P.2d at 478.

"[T]he rule of adjusdem generis [sic] is not properly applicable where the result would be contrary to the plain and clear intention of the parties." Cronkhite v. Falkenstein, Okl., 352 P.2d 396 (1960).

The landowners introduced much testimony to show precisely that landowners had *no* intention whatever respecting helium, and moreover that "gas" or "natural gas" would evoke no association with helium. Dr. Bergen Evans, a noted professor of English, etymologist and lexicographer, canvassed a compilation of 270 dictionary and encyclopedia entries concerning "gas" and "natural gas" [154] and noted the relative infrequen-

154. Helex 128, Parts 1–3.

cy with which helium is mentioned in relation to either term. He concluded thus:

> "* * * I conclude as a lexicographer, not as a geologist or an oil man or a signer of leases, simply as one who has examined the words, on the basis of the 270 dictionary and encyclopedia entries concerning 'gas' and 'natural gas' * * * the said entries appearing over a period of more than fifty years, that the ordinary man could not be reasonably expected to connect 'helium' with 'natural gas.'"[155]

He also examined a series of newspaper searches, one covering certain Kansas newspapers, particularly in Liberal and Hutchinson,[156] and another covering newspapers published in Guymon, Oklahoma,[157] between 1920 and 1960. In the Kansas newspapers, helium was mentioned in 163 items over this forty year period, and in 36 items in the Oklahoma newspapers.[158] By extrapolation to demonstrate the lack of association between the two words, he found that the word "gas" appeared singly or in the phrase "natural gas" approximately 213,302 times, and helium, 1,010 times. He concluded, thus, that "the word 'helium' was a very rare word; that the word 'gas' was an exceedingly common word with the implication that 'gas' was very much in the thought of the people in this area at that time, that 'helium' rarely was."[159]

Again, from an examination of a collection of 1,042 articles or excerpted items from 28 daily newspapers and 22 periodicals in which the word "helium" appeared,[160] he concluded that "the association of 'helium' with 'natural gas' or the word 'gas' in the sense of 'natural gas' has over the last 65 years been exceedingly rare."[161]

Dr. Evans' opinion that the word "gas" did not connote helium to the average les-

sor or landowner in Southwestern Kansas, Western Oklahoma or Northern Texas, between 1916 and 1960, is based upon the statistical incidence of the two words and the relative frequency of their association in dictionaries, encyclopedias, area newspapers and selected magazine articles.

The evidence seems clear that "gas" did not connote helium specifically to the average lessor, and that no landowner specifically contemplated helium in granting rights to produce "gas." Similarly, however, there is no evidence that any landowner regarded oil as a physically pure mixture of liquid hydrocarbons, or regarded gas as composed solely of hydrocarbons. It would be the sheerest fiction, in our view, to apply the rule of *ejusdem generis* to determine that the average lessor intended *not* to convey helium, when other evidence establishes that he had no intention whatever respecting it.

This question of intention, however, leads to the landowners' fourth argument, which may fairly be summarized as follows. The value of natural gas lies primarily in its suitability for use as a combustible fuel; however, helium is valueless as a constituent of the fuel stream, and the average landowner or lessor could not have intended to convey helium as a part of the gas stream.

The end uses of natural gas produced in the Hugoton and Panhandle fields, however, are not limited to fuel alone, and the economic value of natural gas does not lie in its combustible or hydrocarbon properties alone. The principal use of gas has been and is, of course, for fuel. The second most important use of gas is as a feed stock for petrochemical operations.[162] The manufac-

155. Tr. 13:1160.

156. LOX 776 thru 786.

157. LOX 788.

158. Tr. 11:904; 12:1040.

159. LOX 789; Tr. 13:1148.

160. Helex 131.

161. Tr. 13:1181.

162. Tr. 72:6850–6851; Tr. 52:5009. [Helex 103 shows the actual and theoretical chemical compounds which are or may be

ture of carbon black, by the incomplete combustion of natural gas with oxygen, has long been a major use of natural gas. Until 1942, the greater part of the gas produced from the Panhandle field was used in carbon black manufacture and gasoline extraction, and not to serve pipeline consumer and industrial fuel markets. Natural gas is also used as a pressuring agent in oil production, in fireflood, secondary recovery programs, as a purge for pipelines, and as a cushion gas in underground gas storage reservoirs.

Certainly, it was the common understanding among landowners in the area that the marketability of gas underlying one's property depended upon its being at least moderately combustible, sufficient to justify connection of the well to a pipeline, a town or city distribution system. On the other hand, no lessor ever limited the commercial end use of any gas produced under a lease granted by him, and there is no evidence that any lessor ever intended not to sell any and all gas produced thereunder for whatever market existed. In the only instance before a court where the marketability of a gas depended upon its helium content and fitness for helium extraction, the lessor made no claim that helium did not pass under the lease. On the contrary, when the helium plant closed for want of a market for helium, and production from the well was stopped, the lessor claimed abandonment of the lease. (See the factual situation in Hoff v. Girdler Corp., 104 Colo. 56, 88 P.2d 100 (1939), involving a well serving the Thatcher, Colorado helium plant operated by the Girdler Corporation, referred to earlier herein.)

At least six witnesses who had either taken leases themselves or supervised leasing activities testified that neither they, nor to their knowledge any other landman or lease negotiator, had ever discussed the gas stream sought to be leased in terms of its constituents. The only lease in evidence making specific provision for helium is a lease to the Shamrock Oil & Gas Corp., dated April 13, 1965,[163] long after the commencement of this litigation, where although the conventional granting language of "oil, gas and all other minerals" was unchanged, a special royalty provision for helium was inserted.

In our view, this argument is but an attempt to convert an uninformed popular notion respecting the commercial uses of natural gas into an intention by the lessor to convey only those discrete constituents of the gas stream, the uses of which conformed to that notion. In Utilities Production Corp. v. Carter Oil Co., 72 F.2d 655 (10th Cir. 1934), the Court stated:

"But the argument that the parties contemplated the use of gas only for such methods of operation and development as were known to the industry the day the leases were signed, is specious. It imputes to the parties an intention to encase themselves, during the terms of the leases, in a straightjacket. The oil business, then and now, is one in which changes come with lightning-like rapidity. A review of the patent causes in the courts discloses the frequent and radical changes made in the methods of oil operations and development. The argument leads to the conclusion that

derived from the constituents of natural gas. Hydrocarbon compounds are separated by the process of fractionation, and are put to diverse end uses: e.g., normal butane is used as a propellant in aerosol containers, as a feed stock in the manufacture of synthetic rubber and acetate rayon; both nitrogen and hydrogen are used in the manufacture of ammonia; normal hexane is used as a solvent in food processing. Non-hydrocarbon components of natural gas are also widely used. Phil-

lips, e.g., markets elementary sulphur extracted from hydrogen sulphide, itself combustible though not a hydrocarbon compound. Mercaptans, hydrogen and sulphide compounds, are manufactured from hydrogen sulphide and marketed to stench or odorize natural gas and liquefied petroleum gas. Carbon dioxide is produced and marketed as a separate commodity from natural gas.]

163. Shamrock Ex. 1, No. 103/4530.

residue gas could not be used even for drilling if the lessee used any improvement in drills or casing-shoes which was invented after the lease was made. Such a foreshortened intent cannot be imputed to the parties, for they knew that improvements would come about during the terms of the leases, and must have contemplated the use of such improved methods. * * *" 72 F.2d at 659.

We cannot import into a plain grant of "oil and gas" an intention on behalf of either the lessor to convey, or the lessee to receive, only those gaseous constituents of the stream the end uses of which conform to a subjective notion of the commercial end uses of the gas stream at the time of lease execution. This argument is without merit.

 Landowners' fifth argument rests upon language found in granting clauses of nearly all the leases herein, which describe the lessee's rights upon the premises. Typically, this language provides that the lease is granted for the "sole and only purpose of mining and operating for oil and gas, and laying pipe lines, and building tanks, power stations and structures thereon to produce, save and take care of said *products* or *substances* * * *." [Emphasis supplied.] Landowners argue simply that "[r]eference to things leased, including gas, as products or substances seems wholly incompatible with reference to a state of matter. [Landowners' Post-Trial Reply Brief, p. 19]. This reference is irrelevant, in our view, to construction or interpretation of the word "gas."

No case cited by landowners supports any of their arguments that gas conveyed by oil and gas leases is limited to gaseous hydrocarbons only.

Landowners rely in part upon a group of cases known as the Oklahoma "casing-head gas" cases. In Hammett Oil Co. v. Gypsy Oil Co., 95 Okl. 235, 218 P. 501, 34 A.L.R. 275 (1921), plaintiff owned two-thirds of a 40 per cent inter-est in oil production which had been retained by an original lessee who had subleased part interest to defendant. Defendant contracted with the original lessors to manufacture gasoline from casinghead gas produced from oil wells. Plaintiff asserted that gasoline manufactured from casinghead gas from an oil well was oil, and entitled to royalty thereon. The court stated the familiar standard of interpretation:

"In our judgment the question is not whether gasoline manufactured from casing head gas is oil in a technical sense, but whether it is oil in its ordinary and popular sense, and was so understood by the parties to the oil and gas lease. * * *" 218 P. 502.

The court found that "oil", in its ordinary and popular sense as used in the lease referred to crude oil in its natural state as it was produced from the mouth of the well.[164] The court held that casinghead gas did not constitute oil upon which a royalty was payable.

A different result was reached in Twin Hills Gasoline Co. v. Bradford Oil Corp., 264 F. 440 (E.D.Okl.1919), wherein the lease provided separately for royalty on oil and a yearly payment of $200 on each gas-producing well. It provided further that the lessee would have the right to use casinghead gas from the wells of the lease for their operation. It appears that plaintiff sought $200 for each well from which casinghead gas was produced and sold, notwithstanding an oil royalty was being paid on production therefrom. The court held that casinghead gas was oil, reasoning thus:

"In determining what the intent of the parties was, we look to the surroundings, the location, and the conditions of the oil business at that time. The evidence discloses that casing head gas is a component part of oil, that casing head gas is not made from dry gas, and that it is not a product of dry gas, but that it is a product of wet gas, and that wet gas exists only with

---

164. By necessary implication it does not mean a chemically pure mixture of liquid hydrocarbons.

oil. Therefore, casing head gas is a component of oil." 264 F. at 441.

In George v. Curtain, 108 Okl. 281, 236 P. 876 (1925), the court held specifically that casinghead gas was neither oil nor gas under an oil and gas lease which provided a royalty on oil from an oil well, and on gas from a gas well, but not for gas produced from an oil well:

"[W]here the lease contract * * * was made prior to the time when casing-head gasoline was known to be of commercial value, and no mention made of the casing-head gas to be taken from the oil wells, we are forced to the conclusion that that subject was not within the contemplation of the parties when the lease contract was entered into, and is therefore not covered or controlled by said lease contract." 236 P. at 877.

The basis for this rule is stated in Broswood Oil Co. v. Sand Springs Home, 178 Okl. 550, 62 P.2d 1004 (1936):

"Common usage of the terms 'oil' and 'natural gas' is the basic principle upon which the foregoing holding is based. A lease executed for the sole and only purpose of mining for oil and gas, reserving to the lessor a royalty on oil and on gas, means oil in its ordinary acceptation and *gas from a gas well as the same is ordinarily understood* * * * and in the ab-

sence of a contrary intention of the parties the courts will so construe the lease contract. Sections 9467, 9468, O.S.1931." 62 P.2d at 1006. [Emphasis supplied.]

In Navajo Tribe of Indians v. United States, supra, the court suggested that the "Oklahoma courts were motivated by a desire to insure adequate compensation for the lessors." 364 F.2d at 326. It may equally be argued, however, that the Oklahoma courts regarded the provisions for royalty to indicate the common and ordinary meaning attributed to "oil" and "gas" by the parties, and that gas produced from an oil well did not fall within that manifest contemplation. In Oklahoma, the rules of construction are statutory.[165]

In Lone Star Gas Co. v. Stine, 41 S.W. 2d 48, 82 A.L.R. 1299 (Tex.Com.App.) (1931), plaintiffs had executed certain gas deeds conveying to the defendant gas company all their "rights, title and interest * * * present and prospective, in all natural gas" in the described property, reserving to themselves all oil rights. The defendant later constructed an absorption plant to extract gasoline carried in the gas in the form of vapor. Plaintiff claimed that gasoline thus extracted was oil, not "natural gas", and therefore an one-eighth royalty was due.

165. 15 Okl.St.Ann:
 § 152. A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful.
 § 154. The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.
 § 160. The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed.
 § 161. Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense.
 § 163. A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates.
 § 164. However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract.
 § 170. In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party * * *.

The right to helium was not an issue. The court stated:

> "The gas company paid a large consideration running into thousands of dollars for 'all natural gas' in and under these lands. An examination of the several instruments clearly discloses that the gas conveyed was not limited to any particular kind or character of gas, but the conveyance is all-embracing as regards gas, and covers and includes 'all natural gas.' The term 'all natural gas' would include all the substances that come from the well as gas, and that regardless of whether such gas be wet or dry. *It is undisputed in the evidence that the term 'natural gas' includes numerous elements or component parts, but the very language of the conveyance is such as to include therein all these component parts which were in gaseous form when they came from the wells.*
>
> \* \* \* \* \* \*
>
> This gasoline was separated from the gas and became liquid only when it was subjected to the manufacturing process shown above. It is true that the gasoline element was in the gas when it came from the well, but it was then in gaseous form, that is, it was an element or component part of the natural gas, and gas or natural gas was the thing conveyed by the deeds. The legal effect of the deed was to convey 'all natural gas,' and *by the term 'natural gas' is meant all the constituent elements composing the same.*" 41 S.W.2d at 49, 82 A.L.R. at 1302–1303. [Emphasis supplied.][166]

██ Where language of a contract is doubtful or uncertain, a practical construction which the parties placed upon the contract over a long period of performance may be examined to arrive at the parties' intent and purpose. Moore v. Jones, 215 F.2d 719, 721 (10th Cir. 1954). All the landowners have done is to execute leases drawn by the lessee, and receive the fractional royalty by lessee on all gas produced, without qualifying or limiting the gas upon which such royalty is payable. Royalty clauses typically require payment of a fractional royalty, usually one-eighth, of the proceeds of the gas sold at the well, or if marketed off the lease premises, one-eighth of the market value of the gas at the wellhead. The nearly universal practice is to measure the volume of gas produced from the well by an orifice meter placed at or near the wellhead, which meter measures the entire volume of gas passed through the meter. The royalty is the product of a price stated per Mcf of gas multiplied by the number of Mcf passing through the meter. So, the pertinent conduct of the landowners is to have received payment for many years of a royalty based and computed on the total volume of gas produced, without objecting that the lessee was not entitled to all of the volume for which he tendered payment.

Likewise, lessee-producers have dealt with the total stream produced from the well, without regard to its separate constituents. They have produced it as a single stream, measured it thus and computed royalty payments on a volumetric basis.

██ Moreover, lessee's right to drill, produce and market gas under a lease is exclusive. A lessee "has the exclusive right to produce oil and gas from the premises for the time named in the lease \* \* \*." Shaffer v. Kansas Farmers Union Royalty Co., 146 Kan. 84 at 89, 69 P.2d 4 (1937). It is a grant of the "exclusive right \* \* \* to take all the oil and gas that could be found by drilling wells upon the particular tract." Rich v. Donaghey, 71 Okl. 204, 177 P. 86, 89, 3 A.L.R. 352 (1918), and see In re Levy, 185 Okl. 477, 94 P.2d 537, 538 (1939). In Texas,

---

166. An operating agreement between the parties provided that plaintiff, having reserved the oil, could purchase any well producing oil only, and the gas grantee could purchase all gas wells. The court held the terms "gas" and "natural gas" to be synonymous.

an oil and gas lease grants the lessee exclusive rights to all oil and gas therein. See Howell v. Comm'r of Internal Revenue, 140 F.2d 765 (5th Cir. 1944), certiorari den., Howell's Estate v. Commissioner of Internal Revenue, 322 U.S. 735, 64 S.Ct. 1048, 88 L.Ed. 1569.

The conduct of the parties bears upon another issue, however, insofar as it may be relied upon by any adverse claimant to the funds in issue as a basis for estoppel against the landowners who seek to press their own claims.

In 28 Am.Jur.2d, Estoppel and Waiver, § 27, the writer offers the following encyclopedic definition of estoppel:

"The most comprehensive definition of equitable estoppel or estoppel in pais is that it is the principle by which a party who knows or should know the truth is absolutely precluded, both at law and in equity, from denying, or asserting the contrary of, any material fact which, by his words or conduct, affirmative or negative, intentionally or through culpable negligence, he has induced another, who was excusably ignorant of the true facts and who had a right to rely upon such words or conduct, to believe and act upon them thereby, as a consequence reasonably to be anticipated, changing his position in such a way that he would suffer injury if such denial or contrary assertion was allowed."

■ In Gas Service Co. v. Consolidated Gas Utilities Corp., 145 Kan. 423, 65 P.2d 584 (1937), the court approved the words of another encyclopedist:

"The rule as to what should constitute equitable estoppel is very well stated in 10 R.C.L., page 689. There it is said:

" 'So, while the attempted definitions of such an estoppel are numerous, few of them can be considered satisfactory, for the reason that an equitable estoppel rests largely on the facts and circumstances of the particular case and consequently any attempted definition usually amounts to no more than a declaration of an estoppel under those facts and circumstances. * * * The following, however, may be ventured as the sum of all cases: That a person is held to a representation made or a position assumed, where otherwise inequitable consequences would result to another who, having the right to do so under all of the circumstances of the case, has, in good faith, relied thereon. Such an estoppel is founded on morality and justice.' " 145 Kan. at 435–436, 65 P.2d at 592.

Landowners are not estopped to claim the fund as against the adverse stakeholders, for, to paraphrase *Gas Service Co.*, supra, "there can be no claim that the conduct of [plaintiffs] was influenced by any conduct or concealment or positive action on the part of * * * [defendant landowners]." 145 Kan. at 436, 65 P.2d at 592. For the identical reason, the landowners here are not estopped in their claims to the fund as against their fellow claimants, the lessee-producers, for no conduct of the landowners has in any way prejudiced or otherwise affected the claims of the latter to the fund.

■ In view of the circumstances existing at the time of the lease executions, the definition and usage of terms within the industry, and by the intention of the parties as disclosed by their actions, the court concludes that the grant of gas in each of the leases herein extends to the entire gas stream which emerges at the wellhead absent an express reservation of any constituent products, and that helium passes thereunder unless expressly reserved.

## GAS PURCHASE CONTRACTS

The next question is whether title to helium passed not only from the landowners to the lessee-producers but from the lessee-producers to their pipeline company purchasers. This question rests upon the gas purchase contracts under which the lessee-producers sell and deliver natural gas to the pipeline purchasers.

Insofar as pertinent herein, the typical contract contains a recital clause, a definition of "gas", a dedication or commitment of described acreage, reservations therefrom and processing rights, if any, statements of the quantities to be produced and delivered, pricing provisions, Btu rejection and/or price adjustment clauses, quality standards, provisions for standards and methods of measurement, billing and payment procedures, and warranties of title.

Recital clauses, when they occur, frequently express with varying brevity or elaborateness the interest of the buyer, as owner of a natural gas pipeline system, in acquiring additional supplies of gas therefor.[167]

Definitions of gas are expressly comprehensive, and refer typically, for example, to "all gas produced from gas wells including all gases indigenous to the reservoir * * *;" or "the entire stream flowing from a well including all compounds, elements and, mixtures indigenous to the reservoir * * *;" or "raw natural gas indigenous to the reservoir" or "raw natural gas, without removal of any of its constituents."[168] "Gas" and "natural gas" are used interchangeably throughout these contracts with the same meaning.

Dedication or commitment clauses describe the acreage or wells from which gas is committed to performance of the contract. Every commitment clause contained in a Panhandle contract with a named lessee-producer specifically dedicates *all* gas which is produced, or which can be commercially produced, or in which seller has an interest.[169] Leases

under which production is committed are generally identified in the contracts by legal description of the acreage, name of lessors, dates of leases, and the name and percentage interest of the seller These dedication or commitment clauses made no distinction as to the composition of gas from the committed acreage.

From gas from the committed acreage, there may be reserved to the seller oil, casinghead gas, gas used in lease operations, liquid hydrocarbons, oil or condensate removed by separators, and liquefiable hydrocarbons, all removed according to specific processing rights elsewhere in the contract. It is the practice in the industry that no seller of gas retains rights to process the stream for removal of any of its constituent parts, such as gasoline, or liquid or liquefiable hydrocarbons unless the right is specifically reserved to him in the contract. Six Panhandle contracts, all executed since 1963, reserve to the seller the right to process the gas stream for the extraction of helium, but that if he fails to do so, or to commence extraction within a given period of time, its rights under that reservation terminate.[170]

Statements of quantity to be produced are typically stated in terms of volume. Production from pro-rated wells, of course, is determined by the production allowances assigned by state regulatory bodies. For non-prorated wells, annual production is frequently stated by the contract to be at an annual rate which will cause depletion of the well within a period of years, commonly twenty; non-prorated production may also be stated to be in volumes ratable with all other wells

167. See, e.g., contract dated March 12, 1948, between United Producing Co. and Cities Service Gas Co.:

"Cities is engaged in the business, among other things, of producing and purchasing natural gas and selling same as wholesale to distributors of natural gas in numerous towns and communities in a wide area comprising several states of different climatic and temperature characteristics. In order to meet the requirements of its said customers, it is desirous of obtaining, from time to time,

supplies of merchantable natural gas, in addition to its present supply, that will be ample to meet, insofar as is possible, at all times and over a long period of years, the demands of its customers at the various times such demands occur in its widely distributed markets."
Ashland FPC Rate Schedule 111, Ashland Ex. 5; Tr. 37:3740.
168. Helex Ex. 85, part 1.
169. Helex Ex. 84.
170. Helex Exs. 84, 85.

connected to the buyer's system producing from a common source of supply.[171]

The price is universally stated in cents per thousand cubic feet (Mcf), and the unit of measurement is typically stated as "1000 cubic feet (Mcf) of gas at a temperature of sixty degress (60°) Farenheit and an absolute pressure of fourteen and sixty-five hundredths pounds per square inch (14.65 psia)." [172]

Nearly all contracts held by interpleading plaintiff pipeline companies with named lessee-producers contain what are referred to herein as "Btu" clauses.[173] Btu is the abbreviation for British Thermal Unit, the amount of heat required to raise one pound of water one degree Fahrenheit at 39.2° Fahrenheit. Btu clauses are of three basic kinds. Nearly all contracts contain Btu rejection clauses, which permit the seller to refuse gas which yields less than a specified number of Btu's per cubic foot of gas.[174] The second type, the downward Btu price adjustment clause, or penalty clause, permits the seller to reduce the price payable in proportion that the Btu yield falls below a specific level per Mcf. Rejection and penalty clauses are typically combined, with the penalty invoked at a level somewhat higher than the rejection level. Penalty clauses may require the price reduction to be computed by either a proportionate, calculated reduction in the volumes upon which the contract price is payable[175] or by proportionate reduction in the price itself.[176] A limited number of contracts contain *upward* Btu price adjustment clauses, whereby the price is proportionately increased for gas containing over a given number of Btu's.[177]

171. Helex Ex. 84.

172. *Ibid.*

173. LPX 220.

174. "4.2. Minimum. The gas delivered hereunder shall have a heating value of not less than 1,000 BTU per cubic foot. If the heating value of any gas tendered hereunder shall be below 1,000 BTU per cubic foot, Buyer may, at its option, refuse to accept delivery of such gas, in which event the producing horizon from which the substandard gas is being produced * * * shall be released from the terms and conditions of this Agreement." Gas purchase agreement between Pan American Petroleum Corp. and Panhandle Eastern Pipe Line Co., March 5, 1958, Gulf FPC Rate Schedule 167, Gulf Ex. 18.

175. "If in any month, the average total *heating value*, when saturated with water vapor, of the gas delivered hereunder shall have been less than 1,000 B.T.U. per cubic foot of gas, then the volume of gas measured hereunder during each month shall be reduced by multiplying the volume delivered by the quotient obtained by dividing the average heating value of the gas delivered in B.T.U. per cubic foot by 1,000." Gas purchase contract between United Producing Company, Inc., and Argus Natural Gas Company, August 25, 1943, Ashland FPC Rate Schedule 116, Ashland Exh. 7.

176. "(b) *Adjustment for Deficiency.* If the weighted average gross heating value of all gas delivered hereunder during any month shall be less than 950 Btu per cubic foot when saturated with water vapor, then the applicable price * * * which would otherwise be payable for all gas delivered hereunder during such month shall be reduced by multiplying said price by the quotient obtained by dividing the weighted average gross heating value of the gas so delivered, expressed in Btu per cubic foot when saturated with water vapor, by 950; provided, however, such adjusted price shall never be less than 9.8262 cents per one thousand cubic feet (MCF)."
Contract between United Producing Co. and Northern, now Ashland FPC Rate Schedule No. 122, Ashland Ex. 10.

177. See contract executed April 6, 1960, between United Producing Co. and Panhandle Eastern, now Ashland FPC Rate Schedule No. 142, Ashland Ex. 14:
"(c) *Adjustment of Price*: If the heating value of the gas delivered to Buyer at any delivery point shall be less than 1,000 Btu per cubic foot, then the price payable for such gas delivered at such delivery point shall be proportionately reduced, and, if the heating value of such gas is greater than 1,000 Btu per cubic foot, then the price for such gas shall be proportionately increased. To determine such increased or reduced

Btu clauses are commonly placed in the "Quality" sections of the contracts, which also typically state maximum levels for so-called impurities, such as hydrogen sulphide, sulfur, carbon dioxide, uncombined oxygen, and require that the gas delivered be merchantable, or as produced in its natural state, and that it be practically free of foreign materials and objectionable substances, such as water, crude oil, dust and the like.

Billing is generally provided to be by monthly statements showing the amount in volumes of gas delivered during the preceding month.

We find no contract in which the seller does not warrant title to the gas delivered to the buyer. Such warranties typically extend to all *gas* delivered.

Since 1960, a few Panhandle gas purchase contracts provide expressly for the reservation of helium to the seller in accordance with specified processing rights. One form of reservation permits the producer to remove helium prior to delivery to seller at points at or near the wellhead; as to all helium not so removed, the seller warrants title.[178] Another provision permits the seller to elect within the first two contract years to extract liquefiable hydrocarbons and/or helium, and requires commencement of extraction within three years. Failing this, such rights terminate.[179] A third variation provides that upon failure to commence extraction within three years, seller expressly releases all claims to helium contained in gas delivered under the contract.[180]

Lessee-producers' contentions are basically threefold: that "natural gas", or

"gas", as used in those contracts, is used with a trade or industry meaning to describe gaseous hydrocarbons alone; that by operation of Btu price adjustment clauses payment under those contracts is geared to the hydrocarbon content alone, and helium, although delivered in the gas stream, is not paid for; and lastly, that construction of the contracts to cover helium would be repugnant to both Section 11 of the 1960 Helium Act Amendments, and the Natural Gas Act.

We turn first to the alleged industry meaning of the terms "gas" and "natural gas" to define "a mixture of gaseous hydrocarbons, formed in nature and found in the earth." A number of witnesses with long experience in the industry testified to such a usage.[181] A number of definitions of "gas" and "natural gas" from mining, petroleum engineering, and geology glossaries and dictionaries, the publication dates of which span the period from 1914 to 1965, were introduced into evidence.[182] In the earliest publication, a United States Geological Survey glossary published in 1914, "natural gas" is defined as a "mixture of gaseous hydrocarbons found in nature; in many places connected with deposits of petroleum, to which the gaseous compounds are closely related," [183] a definition which appears frequently thereafter. A petroleum refining glossary published in 1953 by the American Petroleum Institute defines "natural gas" as "[g]aseous forms of petroleum, commonly called 'natural gas,' [which] consist of mixtures of hydrocarbon gases and vapors, the more important of which are methane, ethane, propane, bu-

price, the applicable price * * * shall be multiplied by a factor, the denominator of which shall be 1,000 and the numerator of which shall be the heating value of the gas delivered at such delivery point; provided, however, notwithstanding anything herein to the contrary, the factor used in determining such increased price shall not in any event exceed 1.2 even though the heating value of the gas is found to be in excess of 1,200 Btu per cubic foot."

178. See, e. g., Ashland Exh. 17, p. 17.

179. Ashland Exh. 14, p. 29.

180. E.G., Cities Service Oil Exh. 6, FPC Rate Schedule 138, p. 24 of contract dated March 24, 1960.

181. Tr. 37:3731, 3737; 43:4275–4290; 44:4297–4299.

182. LPX 241, 242.

183. Ibid.

tane, pentane and hexane, all of the paraffin series * * *." [184]

Another of the dictionaries offered by lessee-producers was cited in Deep South Oil Co. of Texas v. F.P.C., 247 F.2d 882 (5 Cir., 1957).

"Petitioner also insists that the casinghead gas which it sells is not 'natural gas' within the meaning of the Act. For answer we deem it sufficient to say that there is nothing in the general language used in the definition of 'natural gas,' quoted above, which suggest that a special or narrow or unnatural definition was meant. Boone's Petroleum Dictionary (1952) defines natural gas as *a mixture of gaseous hydrocarbons found in nature* * *." 247 F.2d at 888.

The Boone definition is identical with the 1914 U.S.G.S. definition. The Natural Gas Act, 15 U.S.C. § 717 et seq., is of little assistance. It defines "natural gas" simply as "either natural gas unmixed, or any mixture of natural and artificial gas." 15 U.S.C. § 717a.

The helex parties counter with their own definition of "Natural gas of commerce * * * [as] a hydrocarbon mixture generally containing other gaseous substances, some of which are inflammable, some non-inflammable, and others corrosive in their natural and combustion states." [185] The helex group likewise responded with witnesses also of long familiarity with the petroleum producing and transporting industry, who had never heard of the lessee-producers' alleged industry usage. [186]

In dealing with similar claims regarding the leases, we found that no such usage existed. For the same reasons, we must reiterate that finding here. The term "natural gas" came into existence, it was testified, to distinguish or differentiate fuel gas discovered in underground reservoirs from artificial or manufactured gas, the former having approximately twice the heating value and efficiency of the latter. As we stated before, there is no gas naturally occurring in the entire Hugoton area which consists solely of hydrocarbons, and hence, which would conform to the alleged usage.

The Btu clauses provide the core of the lessee-producers' second argument that only heat-producing hydrocarbons are conveyed under their gas purchase contracts. They characterize these clauses as the "tool * * * developed by the pipeline companies and by the industry as a whole to accommodate the needs and desires of the pipelines for merchantable gas and to pay only for the hydrocarbons which they received from the producers." [187] In sum, it is argued that pipeline companies purchase not natural gas, but energy, that the energy of natural gas derives solely from the gaseous hydrocarbons, and that Btu clauses are the means provided to conform payments to the energy content of the gas delivered.

Pipeline companies respond that they buy and pay for volumes of gas as produced from the well, without regard to its constituents. They point out the limited operation of Btu price adjustments in purchases by each of the plaintiff pipeline companies. For example, of Northern's total 1966 purchases of 195 billion cubic feet of gas, 12 billion, or 6.4%,

---

184. Ibid.

185. Helex Ex. 275. See also a joint publication of the American Gas Assoc., American Petroleum Institute and the Canadian Petroleum Association concerning reserves of natural gas in the United States and Canada, dated December, 1966, which states as follows:

"For the purpose of the committee report, natural gas is defined to be a mixture of hydrocarbon compounds and small quantities of various non-hydrocarbons existing in gaseous phase or in solution with oil in natural underground reservoirs at original reservoir conditions. The principal hydrocarbons usually contained in the mixture are methane, ethane, propane, butanes and pentanes and typical non-hydrocarbon gases which may be contained in reservoir natural gas are carbon dioxide, hydrogen sulphide, nitrogen * * *." LPX 239.

186. Tr. 48: 4580; 56:5327.

187. Tr. 43:4256.

was subject to Btu penalties for low Btu yield. Of purchases from the Kansas Hugoton, 7.2% was adjusted and in the Guymon Hugoton field, one per cent. Of Cities' total gas purchases in the Hugoton area, Btu penalties were invoked on less than six per cent, and this adjustment, it was testified, was limited to gas purchased from Pan American, which is produced from the so-called "C" acreage in the Kansas Hugoton.[188]

Pipeline companies dispute the argument that inert constituents of the stream are valueless. Indeed, they assert that the inerts are necessary for them to comply with their FPC gas tariffs. The Panhandle tariff provides the following limitation on Btu content:

> "2.2 Heating Value. Gas delivered by Seller shall not have a total heating value above one thousand fifty (1050) or below nine hundred fifty (950) British thermal units per cubic foot." [189]

The Cities tariff provides thus:

> "2. QUALITY
>
> The natural gas supplied hereunder shall be of a merchantable quality and shall have a system wide weighted average total heat content of not less than nine hundred thirty-four (934) British Thermal Units per cubic foot saturated with water vapor under the standard measurement next recited. The Company will, however, endeavor to maintain as nearly as possible a system wide weighted average total heat content of nine hundred eighty-three (983) British Thermal Units per cubic foot * * *." [190]

The Northern tariff provides as follows:

> "2.2 Heating Value. The heating value of the natural gas received by Northern from its sources of supply may vary, but it is expected that the gross heating value of the gas delivered will not be less than 975 nor more than 1025 Btu per cubic foot. However, if in any month the arithmetic average of heating values recorded hourly by Northern's calorimeter shall be less than 975 Btu per cubic foot, then the volume of gas delivered during such month shall be computed by multiplying the volume computed as provided [herein] * * * by a fraction whose numerator shall be such arithmetic average heating value and whose denominator shall be 975.X" [191]

The upper limit is partially, at least, a safety precaution. Delivery of a richer gas than the burner is set for may result in incomplete combustion, smoke, soot, and toxic gases. Any gas in the Hugoton area would yield over 1,050 Btu's (per cubic foot) if all inerts were removed.[192] Thus, the inert constituents of the stream, including helium, are necessary to enable it to comply with its tariffs and to market natural gas thereunder.

Further, the pipelines point out that so long as gas is above the tariff Btu minimum, they realize greater gross revenue from delivery of a lower rather than a higher Btu gas, for the buyer must then purchase a greater volume of gas to obtain the same heat yield. They further point out that the heating value of a gas stream is not directly a function of the inerts contained therein. Thus, of three samples of gas each containing 17.5% inerts by volume, Btu content ranged from 942 to 1005.[193]

Pipelines further point out that both the producing and transportation industries have dealt with gas in its gross volumetric dimensions in numerous ways. Thus, measurement of gas at the point of delivery to pipeline purchasers, whether at the wellhead or elsewhere; reporting of open flow potentials (the gas well can produce against atmospheric pressure); the setting of allowable production amounts by state regulatory bodies; computation of industry taxes, such as

188. Tr. 52:4959–4960.

189. LPX 195; Helex 101; second revised sheet No. 34.

190. LPX 193, Orig. Sheet No. 25.

191. LPX 191, Orig. Sheet No. 128.

192. Tr. 41:4088.

193. Helex Ex. 279.

gross production, conservation and sanitation; measurement of tailgate deliveries at processing plants; estimation of reserves; and measurement of pipeline deliveries to distributing companies —all are done on a volumetric basis.

Lessee-producers find support for their appraisal of the importance of Btu clauses in two proceedings before the Federal Power Commission. In the first, the Commission dealt with the necessity and propriety of *upward* Btu adjustment clauses. Although penalty clauses appear in gas purchase contracts commencing around 1943, and were approved by the FPC when it assumed jurisdiction over independent producers in 1954, it had not approved upward Btu clauses, which provide premium prices for high Btu gas. In this proceeding, the Commission specifically approved upward adjustment clauses, notwithstanding the fact that their operation would increase the cost of such higher Btu gas above the guideline levels which had theretofore been established. The decision to approve such clauses was grounded not upon any effort to correlate prices to energy content as the subject of the sale, but to provide an economic incentive to producers with high Btu gas to introduce such gas into the pipeline market, without first removing the higher hydrocarbons therefrom.[194] The Commission stated thus:

"It is no coincidence that, while downward Btu provisions, usually from a 1,000 Btu base, are found generally in all producing areas, the upwards Btu clause has been limited almost entirely to the five pricing areas involved in the instant certificate proceedings. In these or nearby areas considerable amounts of low Btu gas, ranging as low as 830 Btu per cubic foot, have been discovered and made available for the interstate market. It is essential, if this gas is to be brought up to marketable standards, that it be mixed with higher Btu gas— gas which also is present in consider-

able quantities in the areas, with Btu ranges of up to approximately 1,200 Btu's. It is clear, however, that unless the pipeline is in a position to offer a reasonable premium for the higher Btu gas, the producers will have a strong economic interest to extract the high Btu hydrocarbons from their gas before delivery to the pipeline. * * * Under these circumstances, an appropriate upward Btu adjustment provides the necessary inducement for producers making it possible for the pipelines to acquire the supply of high Btu gas required for blending without which a large supply of low Btu gas could not be brought into the interstate pipeline system. Accordingly, we hold that the upward clauses here in issue are reasonably required by the public convenience and necessity for these areas."

The second proceeding was the Permian Basin area rate proceeding, recently affirmed in toto in Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). In its opinion[195] the Commission approved price adjustments based on Btu content, fixing an upward Btu adjustment from a base of 1,050 Btu's and a downward adjustment, or penalty, from 1,000 Btu's. Thus, gas with a Btu content of less than 1,000 Btu per cubic foot must be sold at a price proportionately lower than the applicable area maximum, and gas with a Btu content of more than 1,050 Btu per cubic foot may be sold at a price proportionately higher than the area maximum. Within the 50 Btu range, no adjustment is made. The following language from the Commission's opinion is pertinent:

"The importance of quality standards as an integral part of our ceiling price becomes readily apparent if it is recognized that gas is purchased for its energy. The price of gas cannot be related to volume alone but must be related to units of energy free of

---

194. See Opinion No. 464, Texaco, Inc., et al., Dkt. No. G–8087 (LPX 218).

195. Excerpted in LPX 219.

impurities and sufficiently compressed to enter the pipeline if it is to serve as a mechanism to assure just and reasonable rates."[196]

"Looking to the future, however, we believe that it is important that we implement the general principle that Btu adjustment provisions 'are in the public interest' advanced in our recent decision in Texaco, Inc., Opinion No. 464 (decided June 10, 1965). While Btu adjustments have not played a major role in the Permian Basin in the past we believe it important that our price for new gas-well gas reflect the energy content of the gas, which in reality is what the consumer is purchasing." [197]

Natural gas is sometimes sold on an energy basis, that is, at a given price per 100,000 Btu's (a therm), and not per Mcf. When gas is purchased on this basis, the contract says so. Such sales are not common. Northern has two contracts in the State of Kansas for direct sales of gas (not for resale) on the therm basis. Northern sells gas under two additional contracts containing Btu adjustment clauses above and below 1,000 Btu. These sales comprise only two percent of Northern's total sales. All other sales are made on a volumetric basis subject to the tariff Btu minimum of 975.

Cities likewise has two contracts, both with one customer, in which gas is sold at a given price per million Btu's. A number of early gas sales contracts between Panhandle and various companies, frequently distributing companies, provided for the sale of gas in both volumes and Btu equivalents.[198] Panhandle's original tariff filed with the FPC provided that the unit of gas delivered thereunder would be the therm.[199] The current tariff provides that the "sales unit of the gas deliverable by Seller to Buyer shall be one thousand cubic feet (MCF) * * *."[200] Thermal content is now but a specification of quality.

Sales, however, are still made on a therm basis by some companies.[201]

■ When gas is sold on a therm basis, the argument is plausible that the buyer purchases only energy. In the purchase of natural gas for resale in interstate commerce, under contracts such as those before us, we cannot but conclude, however, that pipelines purchase not energy, but fuel, which is measured and purchased on a volumetric basis. We cannot so override the plain language of contracts providing for the purchase of *gas* so as to find that the parties were dealing in energy, or British thermal units, alone.

Thirdly, lessee-producers argue that even if the gas purchase contracts be construed to convey the entire stream, the price paid thereunder cannot, as a matter of law, have included payment for

---

196. LPX 219, p. 95.

197. LPX 219, p. 99.

198. See, e.g., a contract dated August 31, 1935, between Panhandle and Detroit City Gas Company, at page 3:
"* * * seller agrees to sell and deliver to buyer, and buyer agrees to buy from seller, all of the natural gas requirements of buyer for the distribution and sale to any and all of its present and future customers and for its own use but not in excess of 90 million cubic feet, or its equivalent 912,000 therms per day, which represents all of the gas seller now believes it can safely contract to furnish buyer at this time." Helex 99, part 3.

199. Helex 100, part 2.

200. LPX 195, Orig. Sheet No. 35.

201. One witness testified before the FPC in the Texaco, Inc., proceeding concerning Btu price adjustment clauses, as to the prevalence of the practice:
"Question: Have you found tariffs which are not on a volumetric basis?
"Answer: Yes. In the past, many of the pipeline companies sold the gas at the city gate on a therm basis but most of the companies have now changed to an M.c.f. sales basis with specific heating value specifications.
"Natural Gas Pipe Line Company currently delivers gas on a therm basis to its distributing company customers. Moreover, a number of distributors sell to their customers on a therm basis or M.c.f. with b.t.u. adjustment basis."
[Tr. 49:4722].

helium. The parties have stipulated that helium-bearing natural gas delivered to Cities Service Gas, Northern Natural Gas, and Panhandle from which helium is subsequently extracted is gas purchased for resale in interstate commerce, that all natural gas purchase contracts and amendments thereto between lessee-producers and Cities Service Gas, Northern Natural Gas, and Panhandle are filed with the Federal Power Commission as part of FPC Rate Schedules under the Natural Gas Act, as amended, 15 U.S.C. § 717 et seq., and that all payments made by these three pipeline companies to lessee-producers are at rates established or permitted to be paid by the Federal Power Commission.[202]

Since June 7, 1954, these sales by lessee-producers to pipelines have been regulated by the Federal Power Commission under the Natural Gas Act, under Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), wherein the Court held that the Commission's jurisdiction extended "over the rates of all wholesales of natural gas in interstate commerce, whether by a pipeline company or not and whether occurring before, during, or after transmission by an interstate pipeline company." 347 U.S. at 682, 74 S.Ct. at 799, 98 L.Ed. at 1047–1048. Later that year, following that decision, the Commission ordered that all independent producers so engaged on or since June 7, 1954, file with the Commission rate schedules consisting of the "basic contract and all supplements or agreements amendatory thereof * * * showing the service to be provided and the rates and charges * * * applicable to the transportation of natural gas in interstate commerce or the sale of natural gas in interstate commerce for resale subject to the jurisdiction of the Commission." [203] An independent producer is defined as "any person as defined in the Natural Gas Act who is engaged in the production or gathering of natural gas and who sells natural gas in interstate commerce for resale, but who is not engaged in the transportation of natural gas (other than gathering) by pipeline in interstate commerce." [204]

No sale may be made by a producer of natural gas in interstate commerce for resale unless there is on file with the Commission a certificate of public convenience and necessity authorizing the sale, and a rate schedule covering that sale, and no payment may be received except at the effective rate on file.

From 1954 through 1960, the Commission attempted rate regulation of independent producers on the basis of conventional company-by-company, sale-by-sale, utility regulation.[205] In 1960, the Commission abandoned this method, and undertook rate regulation on a geographical area basis, dividing the country into 23 pricing areas, and assigning to each preliminary prices called "guideline prices," pending final determination of just and reasonable rates for each of these areas. The prices thus set constituted maximum prices for each area.

These guidelines were applied to rates in the following manner. If a rate increase was filed by the parties to a gas purchase contract which did not increase the rate above the area guideline, the new rate would be approved automatically. If the new filed rate was higher than the guideline, the increase would be suspended and an investigation commenced. Thus, the contract price in some instances may exceed the FPC-approved service rate, where the contract price exceeds the guideline prices and has been suspended pending investigation.

The Commission is also charged with rate regulation of pipeline companies, which is based on conventional public utility regulation, the basic principle being "to prescribe rates which will give

---

**202.** Pre-Trial Order, p. 12 ¶¶ C, D, E.

**203.** 18 CFR § 154.93.

**204.** 18 CFR § 154.91(a).

**205.** Tr. 73:6937.

the company the opportunity to generate revenues sufficient, after meeting all reasonable operating expenses, depreciation and taxes, to yield to the company profits * * * roughly comparable to those of companies engaged in comparable risks."[206] The sum of these expenses, depreciation, taxes, and return on investment, constitute a company's cost of service, after recovery of which the company earns a profit. A pipeline may engage in what are described as nonjurisdictional activities, such as the extraction of hydrocarbons, which the Commission is not empowered to regulate. Thus, the sales of the products of such extraction are not subject to Commission rate regulation. However, the earnings realized from such non-jurisdictional activities are credited to the jurisdictional income of the company, or against its cost of service, in computing the profits realized by the company. Inasmuch as the earnings from the sale of hydrocarbons are proportionately greater than the earnings from the sale of natural gas, the earnings from nonjurisdictional hydrocarbon extraction operate to reduce the rates it will be permitted to charge for jurisdictional sales of natural gas. Stated otherwise, profits from hydrocarbon extraction are credited to the profits realized from natural gas sales, and permit a reduction in gas rates, with the end result that the returns to the pipeline from nonjurisdictional activities are reduced to the average earned on the whole of its system.

In drafting the Helium Act Amendments of 1960, it was thought that absent express provision, revenues from helium activities accruing to any pipeline company or other company subject to the rate-making jurisdiction of the Federal Power Commission would be similarly treated, and it was anticipated that industry participation would be

more difficult to promote if participating companies could anticipate only a public utility rate of return on its investment. Accordingly, to provide an economic incentive to industry to undertake helium conservation, the Department of the Interior proposed to exempt helium extraction operations from the provisions of the Natural Gas Act and the jurisdiction of the Federal Power Commission.

Section 11 of the 1960 Amendments provided accordingly:

"The provisions of the Natural Gas Act of June 21, 1938, as amended, shall not be applicable to the sale, extraction, processing, transportation, or storage of helium either prior to or subsequent to the separation of such helium from the natural gas with which it is commingled, whether or not the provisions of such Act apply to such natural gas, and in determining the rates of a natural gas company under sections 717c and 717d of Title 15, whenever helium is extracted from helium-bearing natural gas, there shall be excluded (1) all income received from the sale of helium; (2) all direct costs incurred in the extraction, processing, compression, transportation or storage of helium; and (3) that portion of joint costs of exploration, production, gathering, extraction, processing, compression, transportation or storage divided and allocated to helium on a volumetric basis." 50 U.S.C.A. § 167i.

During committee hearings on this section, FPC representatives objected that it jeopardized Commission jurisdiction over any stream of natural gas containing helium. It was made clear in both the hearings and floor debate that FPC jurisdiction over natural gas containing helium was to be unaffected by the amendment.[207]

---

206. Tr. 73:6912–13.

207. This section was not in the proposals first submitted to Congress in 1958. It appeared first in the redrafted proposals submitted in 1959, in the following form:

"SEC. 9. The provisions of the Natural Gas Act * * * shall not be applicable to the sale, extraction, processing, transportation or storage of helium, either prior to or subsequent to its *separation* from the natural gas with which it

No party here seriously contends that Section 11 strips the Commission of all its power to determine the rates at which helium bearing natural gas may be sold by lessee-producers to pipeline purchasers, or the rates at which pipeline companies may sell this gas for resale. There has been no change in the methods of Commission regulation of independent producers as a result of the Helium Act Amendments.

The question is whether or not although lessee-producers have contracted for the sale of the entire gas stream, they have received any payment for the helium constituent thereof since 1960. This question is premised on the contention that the Helium Act Amendments of 1960 oust the FPC of rate-making jurisdiction as to all sales of helium, " * * * either prior to or subsequent to the separation of such helium from the natural gas with which it is commingled, * * *."[208]

The section was manifestly intended to give any company which is otherwise regulated by the Federal Power Commission complete freedom from Commission regulation in any transaction for the sale, processing, tranportation of helium, either commingled with the stream or separate therefrom.

Section 15, 50 U.S.C. § 167m, of the Amendments, provides:

"It is the sense of the Congress that it is in the national interest to foster and encourage individual enterprise in the development and distribution of supplies of helium, and at the same time provide, within economic limits, through the administration of this chapter, a sustained supply of helium which, together with supplies available or expected to become available otherwise, will be sufficient to provide for essential Government activities."

The pipeline companies argue that Section 11, making the Natural Gas Act inapplicable to the "sale, extraction * * of helium either prior to or subsequent to the separation of *such* helium," applies only to transactions respecting the sale of helium as a separate commodity, and not merely as a component of an entire gas stream. Stated otherwise, it is argued that Section 11 applies only to such helium as is specifically and/or separately the subject of a sale.

"The regulatory system created by the [Natural Gas] Act is premised on contractual agreements voluntarily devised by the regulated companies; it contemplates abrogation of these agreements only in circumstances of unequivocal public necessity." Permian Basin Area Rate Case, 390 U.S. 747, 88 S.Ct. 1344, 1388, 20 L.Ed.2d 312, 367 (1968). We have held that lessee-producers contracted to sell, and pipeline companies contracted to purchase, the entire gas stream with all its components, except those expressly reserved.

is commingled, whether or not the provisions of such Act apply to such natural gas, and, in the determination of rates under Sections 4 and 5 of the Natural Gas Act as amended, the income received from such helium shall not be considered and no exploration, production, gathering, extraction, processing, compression, transportation, storage or other costs which were or would have been incurred in the absence of the extraction of the helium shall be allocated or assigned to the helium." [Underlining supplied.]

In response to the FPC fears for its jurisdiction over the entire gas stream notwithstanding helium contained therein, the language underlined was deleted, and the language "the separation of such helium" inserted. During debate on the Senate floor, Senator Carroll stated thus:

"I wish the RECORD to be crystal clear, so that any court which reads this RECORD will know what is the specific legislative intent, namely, that we are not exempting helium-bearing gas from jurisdiction by the Federal Power Commission under the Natural Gas Act. There can be no question about that. For anyone who reads the hearings of the Senate Committee, the report of our committee, my own individual views, which are a part of the Interior Committee reports, and, I hope, the debate this evening."
106 Cong.Rec. 18603 [Helex 281, part 9.]

208. Ibid, Sec. 9 became Sec. 11. See 50 U.S.C. § 167.

We think it cannot be disputed that one purpose of Section 11 was to permit parties otherwise subject to FPC regulation to contract for the sale of helium whether commingled with the natural gas stream or not, without FPC regulation. That right is not in issue here, as the pipeline companies point out. The only question is whether the section entitled vendors of helium-bearing natural gas to recover from their purchasers a sum for helium sold under their respective rate schedules above that contractually agreed upon by the parties prior to 1960 as the price of the entire stream.

■■■ The argument for lessee-producers is appealing. The Helium Act Amendments created a market for helium which did not theretofore exist. The United States became a major potential purchaser of helium, to supply a newly created demand for helium to meet not only current, but future needs. Prior to 1960, pipeline companies had realized nothing out of helium. For many years it had been a useful, scarce and wasting natural resource. It was not one of economic importance to the pipeline companies, however, who regarded it as a valueless diluent of the heating value of the stream until a market was created. The passage of the Act created a market for helium, and caused it to become a national resource of major economic importance, solely by virtue of the United States' interest in conserving and purchasing it. Certainly, one effect of Section 11 is to permit contracting parties to recognize its newly acquired economic importance in future contracts for its sale, without regard to FPC regulation of natural gas prices. We do not think that Section 11 was intended to relieve all lessee-producers selling helium-bearing gas from contracts which they might regard as unfair, simply because of a subsequently created market for a constituent of the gas stream which they sell. We must conclude that Section

11 of the Helium Act Amendments does not alter the scope of the gas purchase contracts, does not strip the helium from the gas stream for which the stated price is being paid, and does not *require* that persons contracting for the sale of gas contract separately for the sale of the helium constituent. It merely permits them to do so, and when they have not, the contract must stand as it is written.

### F.P.C. PRIMARY JURISDICTION

■■■ A question remains with respect to the alleged primary jurisdiction of the Federal Power Commission over the matters involved here. Both Northern and Cities moved to stay proceedings in their respective cases herein, pending determination of certain issues by the F.P.C.[209] Northern proposed that the court refer two issues for Commission determination; that is, whether lessee-producers' rates on file with the Commission apply to the entire gas stream sold and delivered under lessee-producers' sales contracts, and whether landowners' royalties must be computed only upon those filed rates.

The Cities' issue, already pending before the Commission in designated proceedings, was "whether * * * landowners and producers * * * can lawfully collect more for the gas produced from their well and sold in interstate commerce than that permitted under the defendant producers' F.P.C. Gas Rate Schedules.[210]

The court overruled these motions on the grounds that the issues in the pending F.P.C. proceedings were neither the same nor germane to those herein; that no determination of the issues in those cases would materially assist in the instant cases; and that under Section 11 of the 1960 Helium Act Amendments no issue respecting helium *could* lie within the jurisdiction of the F.P.C.[211]

209. Dkt. Nos. 1209, 1211, KC–1969.

210. Dkt. 1211, KC–1969.

211. Dkt. No. 1225, KC–1969.

The court has previously ruled, pp. 30–32, supra, that there is no jurisdiction of landowners' cross-claims for royalty payments from lessee-producers because such claims do not affect their right to participate in the interpleaded fund. Both Cities and Northern have persisted in the view that because helium is in the gas stream, that the Natural Gas Act gives them primary jurisdiction of these proceedings and have relied in part to sustain their position upon J. M. Huber Corporation v. Denman, 367 F.2d 104 (5th Cir. 1966). The lower court in that case held that plaintiff lessors were entitled to royalties computed on the basis of actual "market value" of the natural gas, whether or not such value conformed to the rates being collected by the lessee-producer defendant, the Huber Corporation, which rates are regulated by the F.P.C. This ruling was affirmed in J. M. Huber Corporation v. Denman, supra. However, the court remanded the case for further proceedings with the following direction:

"Specifically, the District Court should defer further action including fixing of the actual 'market price' pending invocation by the parties of a ruling by the FPC: (1) (a) as to the jurisdiction of the FPC over payment for royalties for gas sold for resale and transported in interstate commerce, (b) the status of a royalty interest owner's transaction as a sale under the Act where incident to a sale for resale and transportation in interstate commerce, (c) the status of the royalty interest owner's transaction in this case as a sale under the Act * * *." 367 F.2d at 121 [Footnote omitted.]

Plaintiffs thereupon petitioned the F.P.C. for a declaratory order that the Commission does not have jurisdiction over gas royalties paid them by the Huber Corporation.[212]

Meanwhile, royalty holders commenced lawsuits in Kansas courts seeking, as in *Huber*, supra, recovery of royalties computed not upon the F.P.C.-approved rates collected by their producer, Mobil, but upon the market value of gas produced and sold by it. Mobil thereupon invoked the primary jurisdiction of the Commission, seeking a determination that it *does* have jurisdiction over royalty payments to lessors.[213]

The Commission consolidated these two proceedings with one other,[214] which raised an identical basic question:

"[C]an persons contractually entitled to royalty payments for natural gas sold for resale in interstate commerce be classified as 'natural-gas companies' within the meaning of the Natural Gas Act and subject to the jurisdiction of the Commission." [215] The Commission defined the scope of the hearing to be held thus:

"The hearing in these cases shall be confined to resolving whether the Commission has jurisdiction over a landowners' royalty interest in natural gas leaseholds and, if answered in the affirmative, how such jurisdiction should be implemented. * * *

"The examiner will consider the questions raised in Docket No. RI67–114 with respect to helium only as the facts on this subject bear upon the royalty interest of landowners in natural gas leaseholds. These will in no way require consideration of any question foreclosed to this Commission's jurisdiction by the Helium Act. (74 Stat. 918) 50 U.S.C. Sec. 167*l*.

"Contractual issues relating to the specific royalty payments to which any particular lessor is entitled under this lease agreement will not be the subject of this hearing." [216]

212. William Harvey Denman, Trustee v. J. M. Huber Corp. Dkt. No. RI67–113.

213. Mobil Oil Corp. v. Carl F. Matzen, et al. Docket No. RI67–114.

214. Western Natural Gas Co. v. Elmer Hennigh, et al. Docket No. RI67–310.

215. Dkt. No. 1210, Ex. C, p. 2, KC–1969.

216. Id. at p. 3.

So far as appears, helium was mentioned in only one of the three consolidated cases, Mobil Oil Corp. v. Matzen, et al. Mobil alleged that as lessee of Matzen, et al., it produced, sold and delivered all gas as entitled under its leases, excepting that it did not sell helium to its gas purchasers. Nowhere did it appear that the lessors relied upon the presence of helium in the natural gas as a factor in establishing market value.

In J. M. Huber v. Denman, supra, the Fifth Circuit referred to the F.P.C. the question of its own jurisdiction over royalty payments. Under Section 11 of the 1960 Helium Act Amendments, even that ground for referral is lacking, for thereunder the Natural Gas Act "shall not be applicable to the sale * * * of helium * * * [even] prior to * * * the separation of such helium from the natural gas with which it is commingled, whether or not the * * * Act [applies] to such natural gas. * * " Thus, even if the Commission should assume jurisdiction over royalty payments, it would appear that it could not regulate any royalty demanded by a lessor attributable to helium alone.[217]

The doctrine of primary jurisdiction is explained thus in United States v. Western Pac. Railroad Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956):

> "The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. * * * 'Primary jurisdiction,' * * * applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. * * *

> "No fixed formula exists for applying the doctrine * * *. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation. * * * In the earlier cases emphasis was laid on the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions. * * * More recently the expert and specialized knowledge of the agencies involved has been particularly stressed. * * * The two factors are part of the same principle ' * * * that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. * * * '" 352 U.S. at 63, 77 S.Ct. at 164, 1 L.Ed.2d at 132.

It is true that the Commission has long regulated the sale of natural gas for resale in interstate commerce, and that such gas does contain helium. However, the questions here have not raised issues of fact "not within the conventional experience of judges," or questions requiring or warranting the exercise of administrative discretion. The issues of whether title to helium passed under the leases, and whether royalties paid thereunder constitute payment for helium, raise factual and legal questions judicially determinable. Moreover, whether the Commission's jurisdiction extends to royalty payments received by lessors does not affect whether the lessors, or landowners have in fact conveyed the helium contained in that natural gas. If they have, or have not, it is not because of any jurisdiction, or lack of it, in the F.P.C. over royalty payments received by landowners.

217. See royalty provision in Shamrock Ex. 1, lease 103/4530.

## UNJUST ENRICHMENT

 Lessee-producers and landowners also claim the funds on the ground of unjust enrichment. The arguments previously considered constitute the premise by which they seek to enforce this claim.

They point out that when most of the leases and gas purchase contracts were executed, helium was regarded as only an inert diluent of the stream without value in itself, and that landowners, pipeline purchasers and lessee-producers had no reason to anticipate that Congress would suddenly recognize it as a valuable natural resource and create a major new market for it. They argue that they are "economically powerless" to extract it prior to delivery of the gas stream to the pipelines, pointing out that they can not, under the rules and regulations of the F.P.C., discontinue or abandon delivery of the stream. They justly regard the money received by the extraction companies from the United States as a "benefit" to the former, but complain that it accrues to those companies not at the expense of the United States, but to the expense and detriment of themselves, the landowners or the lessee-producers.

The unjust enrichment claim is based fundamentally upon alternative premises: 1) that title to helium did not pass under the leases or gas purchase contracts and that the extraction companies have converted it to their own use and benefit; and 2) that the pipeline purchasers paid only for hydrocarbons, and paid no consideration for helium, and now having sold it for valuable and substantial consideration, must respond from those proceeds to their vendors, for the fair market value of said helium.

We have already disposed of both premises. We have held that title to helium passed to the pipeline purchasers under their leases and gas purchase contracts, and secondly, that payment for gas under those contracts was not limited to the hydrocarbon portion alone, but was intended and received as payment for all constituents of the entire stream as produced from the well.

Landowners and lessee-producers find further support for their unjust enrichment argument in an alleged privileged position enjoyed by members of the helex group ever since the inception of the helium program. They argue that ever since Dr. Seibel's report in 1956, proposing the construction of extraction plants on large-volume pipelines leading from the Hugoton area, the government program has been oriented to pipeline extraction plants, without regard to the ownership of helium and that independent producers were never seriously considered as probable processors of helium. It is further argued that the contracts ultimately executed by the extraction companies insulate the latter from virtually all economic risk, providing guaranteed minimum sales for a 22-year period, at a guaranteed price, limited liability in the event of failure of title to helium, plus the realization of collateral economic benefits, such as decreased transportation costs of a gas stream from which inerts have been removed, and the removal of greater quantities of liquid hydrocarbons made possible by the extraction process.

The foregoing contract features and collateral economies would inure to the benefit of *any* party contracting with the United States in the conservation program. Assuming, *arguendo*, the contracts advantageously minimized the risks of undertaking helium extraction for the conservation program, and afforded participants favorable economies in other respects, these factors do not make the consequent enrichment of corporate coffers unlawful or inequitable as to third parties in any manner cognizable at law.

In preparing cost build-ups as a basis for negotiating the helium purchase contracts, the Bureau included as one of the contractors' costs, two dollars per

Mcf for recoverable helium contained in natural gas processed for extraction. It said:

"The initial unit price will be a negotiated price. On our side of the table, we will calculate what we consider to be a fair and reasonable price by first computing the estimated unit cost of extracting helium in a Government plant under similar circumstances, and then adding an amount to cover taxes, insurance, and any other costs applicable to a private plant, plus a 6½ per cent annual rate of return, after taxes, on the undepreciated plant investment * * * In this calculation, we will include as cost items in a Government operation a payment of $2.00 a thousand cubic feet for recoverable helium in the natural gas processed, and an appropriate payment for fuel gas and other gas shrinkage in the plant." [218]

Two views may be taken of this allowance. The Director of the Bureau of Mines justified it to the General Accounting Office as the fair and reasonable value of helium in the stream, and a fair estimate of the helium cost the United States would incur in a government-owned plant. The Director wrote:

"In negotiating prices with the companies, the Bureau considered the helium in the natural gas streams prior to processing to be worth $2.00 a thousand cubic feet. Because the helium content of the gas to be processed by the companies varies from company to company and because 100 percent of the helium in the gas cannot be economically recovered, the equivalent value of the recoverable helium in the natural gas varies from company to company—averaging about $2.30 a thousand cubic feet.

"We considered this as an item of cost in our calculations because in our chosen approach it would have been an item of cost in a Government plant. The basic $2.00 figure is not an arbitrary figure. The Bureau of Mines is presently paying the equivalent of this amount for the privilege of extracting helium from gas supplied by gas companies at the Government's Keyes, Oklahoma and Shiprock, New Mexico plants. * * *

"In view of the foregoing and in the light of abundant testimony by the Bureau of Mines before congressional committees relevant to the importance of helium, it is extremely unlikely that a value lower than $2.00 could be obtained either through negotiation or condemnation. *One might argue that helium currently wasted in fuel gases has no value, but such an argument becomes invalid when someone decides to extract the helium for conservation or sale. We believe the $2.00 figure represents a just and reasonable value for helium in natural gas processed for helium extraction, without regard to who does the processing * * *. Consequently, we did not require the companies to show that the $2.00 would be an item of cost, because we do not think it is pertinent."* [219]

The Comptroller General viewed this allowance of $2.00 per Mcf for helium as mere profit to the contractors, totalling over the life of the contracts $144 million unjustified costs to the United States and equivalent profits to the contractors over and above the profits already provided in the cost build-up. In his report to Congress he stated:

"On the basis of our review of the Bureau's estimates of the contract unit prices, it appears that the Government will incur unjustified costs of at least $155 million. An equivalent amount will be received by the contractors as profits over and above the $158 million allowed as profits in the composition of prices prepared by the Bureau. Of the $155 million

---

218. LPX 91, App. 33.

219. LPX 182, p. 7.

of unjustified costs, $144 million represents special allowance for the helium content in the natural gas * * *. The special allowances were included in the Bureau's initial estimates without establishing that any associated costs would be incurred by the contractors, and the negotiation records do not show that the contractors requested or required the special allowance as an added profit payment for the value of the contained helium. [p. 6]

\* \* \* \* \* \*

"We consider that it was inappropriate for the Bureau to have included in its estimates special allowances of $144 million for an element that was being dissipated when included in the natural gas sold as fuel. [p. 9.] * * *

"The fact that an amount equivalent to the $2 special allowance per MCF had been paid as a fee for permitting the Government to extract helium from natural gas at the Keyes plant did not necessarily mean that such amount. should or need be paid under an entirely different contract arrangement under which the contractors would otherwise be provided a profit for their participation in the program." [p. 10.] [220]

It would appear that based upon the G.A.O. Report, landowners and the lessee-producers are contending that the extraction companies are being unjustly enriched, the former claiming it to be at the expense of the United States and its taxpayers, the latter deeming it to be at their own expense. The alleged enrichment of the extraction companies does not result from any breach of a legal or equitable duty owing to the lessee-producers or landowners. So far as appears, any profits result solely from the judgment of the Bureau of Mines in its estimation of the amount the Government determined its contractors would require to extract helium and this, in turn, was based upon the estimated cost to the United States to operate its own plants. In Anderson v. Anderson, 155 Kan. 69, 72, 123 P.2d 315 (1942), the court stated, quoting American University v. Forbes, 88 N.H. 17, 183 A. 860:

> " 'The doctrine of unjust enrichment is that one shall not be allowed to profit or enrich himself at the expense of another contrary to equity. While it is said that a defendant is liable if "equity and good conscience" requires, this does not mean that a moral duty meets the demands of equity. There must be some specific legal principle or situation which equity has established or recognized, to bring a case within the scope of the doctrine.' "

A benefit is not unjust unless it is unlawful and the injustice must be one for which the law gives redress under its rules The claim of unjust enrichment can only be made, if at all, by the United States and this it has not done. If the extraction companies are unjustly enriched by the United States, landowners and lessee-producers are not entitled to a share in the funds on the ground that it is at their detriment or expense.

## SUMMARY

We summarize our conclusions respecting the claims of landowners as follows:

That landowners in each of the interpleader cases can sue and be sued herein as a single class, that the interests of all members of the landowner class in each case have been adequately represented by those named landowners appearing both individually and as representatives of absent members of each class, and that division of each such landowner class into subclasses is un-

**220.** Comptroller General's Report, "Examination of Procurement of Crude Helium for the Helium Conservation Program under Negotiated Fixed-Price Contracts —Bureau of Mines—Department of the Interior." January, 1963. [LPX 185.]

necessary to the adequate representation of the absent members of each such class;

That landowners are not barred by either waiver or estoppel from asserting that helium is not conveyed under their oil and gas leases;

That in any oil and gas lease, or lease for gas only, under which natural gas is produced from any field involved herein, which gas is subsequently processed for the extraction of helium, the words "gas" or "gases" are used interchangeably to describe any naturally-formed aeriform substances indigenous to the underlying reservoir, which aeriform substances include helium; and the natural gas stream conveyed under those leases includes, except as reserved, both hydrocarbon and non-hydrocarbon elements and compounds, including helium;

That in these interpleader actions, the Court has no jurisdiction of landowners' claims against their co-defendant lessee-producers, for any separate or additional royalty for the helium constituent of the gas stream;

That the Court further has no jurisdiction to entertain landowners' claims for cancellation of the leases as to helium, for alleged breaches of implied covenants to market helium with reasonable diligence;

That landowners are not entitled to participate in the interpleader funds on the ground that plaintiffs are unjustly enriched at the expense and detriment of said landowners;

That Section 11 of the 1960 Helium Act Amendments did not abrogate the aforesaid leases, insofar as the conveyance of helium is concerned;

That royalty payments for natural gas paid and received by landowners under the lease agreements are not rendered illegal or insufficient as payment for helium because said payments were made by lessee-producers whose rates are regulated and approved by the Federal Power Commission.

We summarize our conclusions respecting the claims of lessee-producers as follows:

That named lessee-producers appear in each of the interpleader cases, both individually and as representatives of the class of lessee-producers described for each case, and that lessee-producers in each case may sue and be sued as a single class;

That defendant lessee-producers are not barred by waiver or estoppel to assert their claims to helium by their conduct respecting the contracts under which they sell and deliver natural gas to their pipeline purchasers, and that interpleading plaintiffs are likewise not barred by waiver or estoppel from asserting that their gas purchase contracts do convey and provide payment for helium;

That the natural gas purchase contracts under which lessee-producers sell and deliver gas to their pipeline company purchasers apply to and convey the entire natural gas stream, except as reserved, and the natural gas stream conveyed under those contracts includes both hydrocarbon and non-hydorcarbon elements and compounds, including helium;

That the parties to these contracts have not by their conduct with respect thereto, either expressly or impliedly amended, reformed, rewritten, or modified those contracts;

That payments received under those contracts by lessee-producers from their pipeline purchasers constitute payment for the entire natural gas stream measured and delivered thereunder, including both hydrocarbon and non-hydrocarbon constituents (including helium) of the stream, except as reserved to the seller;

That payments made and received under those contracts are not, thus, for

hydrocarbons alone, or for British thermal units;

That the contracts thus construed are not so unconscionable, or against public policy, so as to be invalid and unenforceable under the circumstances;

That Section 11 of the 1960 Helium Act Amendments did not abrogate those contracts insofar as the conveyance of helium is concerned;

That payments for natural gas made and received under those contracts are not rendered illegal, or insufficient, as payment for helium because said payments are made at rates regulated and approved by the Federal Power Commission;

That no lessee-producer is entitled to recover, as payment for helium, the difference, if any, between any price stated in its natural gas sales contracts, or in any contract price resulting from an arbitration award, and the FPC-approved service rate being collected, whether the contract price is or is not approved for collection subject to refund;

That lessee-producers are not entitled to participate in the interpleaded funds on the ground that plaintiffs in interpleader are being unjustly enriched at their expense and detriment.

█ From all of the foregoing conclusions, it follows that the landowners' claims against the United States in Case No. W–3009 and Case No. W–3159 must fail. We have found that the landowners did, in fact, convey to their lessees all rights to helium, except as may be reserved, as a part of the natural gas stream. Lacking title, landowners' claims for conversion of helium under the Tort Claims Act, 28 U.S.C. § 1346(b), must fail. Likewise, based upon the findings herein, their standing to claim a taking of *their* property without just and reasonable compensation, the reverse condemnation claim under the Tucker Act, 28 U.S.C. § 1346(a) (2), must be denied.

### COSTS

█ Rule 54(d), F.R.Civ.P., provides in pertinent part as follows:

"Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs; but costs against the United States, its officers, and agencies shall be imposed only to the extent permitted by law. * * *"

Allowance of costs to the prevailing party is not an inexorable rule, and the Court may, in its discretion, direct otherwise. We think these cases are particularly appropriate for such direction.

The issues which plaintiffs in the interpleader cases raised for determination are of considerable magnitude, both in the numbers of persons affected thereby, and their financial importance to all claimants to the funds. In each of the interpleader cases, plaintiffs have obtained, in net effect, an adjudication that quiets their title to all helium sold to the United States. The possible rights of ownership of helium in other parties was recognized in each of the contracts from which the interpleader funds derive. The financial burden of any adjudication of liability adverse to plaintiffs was minimized by provisions in each contract requiring the United States to reimburse said companies for all amounts paid by them to any third party or parties found to own said helium, to the extent that such payments exceeded approximately three dollars per Mcf of contained helium.

█ The interpleading plaintiffs, because of their position in the gas industry, are the beneficiaries of a decision of the United States to undertake the necessary conservation of helium. The government enlisted the participation of private enterprise, and interpleading plaintiffs were advantageously circumstanced so to participate. The plan to locate extraction plants on pipelines was formulated within the Bureau of Mines as the most efficient and expeditious means of helium conservation, without regard to possible ownership

rights vested in other persons. The helium purchase contracts with the four extraction companies were entered into, certainly, on the expectation that their ownership of helium and extraction rights was complete. Plaintiffs herein have undertaken to secure a final adjudication of those rights, and we think it only just and equitable that those parties bear the statutory costs (see 28 U.S.C. § 1920), and the cost of notice to claimants (as hereafter ordered by the Court), all of which were incurred in obtaining a foreclosure of all other rights of ownership to helium which they sell to the United States.

## NOTICE AND JUDGMENT

As stated earlier herein, infra, P. 636, we cannot determine in these cases the res adjudicata extent of the judgments to be entered here. However, it is in the interest of justice and economy of litigation, that the extent of the judgments entered herein be as broad as is constitutionally permissible, and this interest may be materially assisted by notice to all absent members of the classes of landowners and lessee-producers prior to entry of judgment.

Accordingly, within thirty days, prevailing counsel will prepare, circulate, and submit the following, consistent with the views expressed herein:

1. A form of notice to be given absent lessee-producers and landowners;

2. A form of judgment denying landowners' and lessee-producers' claims to the interpleader fund, dismissing, for want of jurisdiction or on the merits, the cross claims and counterclaims of landowners, and permanently enjoining said parties from asserting the claims disposed of in these actions; and further, in the suits against the United States, the motion of the United States for judgment is to be sustained. Such form of judgment shall include provision for taxation of costs in accordance

with the Court's views, as expressed herein.

The foregoing findings of fact and conclusions of law are made in accordance with the provisions of Rule 52 of the Federal Rules of Civil Procedure.